AMERICAN EXPORT LINES, INC. *v.* ALVEZ ET AL.

No. 79–1.   Argued February 26, 1980—Decided May 12, 1980

BRENNAN, J., announced the judgment of the Court and delivered an opinion, in which WHITE, BLACKMUN, and STEVENS, JJ., joined. BURGER, C. J., concurred in the judgment. POWELL, J., filed an opinion concurring in the judgment, *post,* p. 286. MARSHALL, J., filed a dissenting opinion, in which STEWART and REHNQUIST, JJ., joined, *post,* p. 286.

*Stephen K. Carr* argued the cause and filed briefs for petitioner.

*Paul C. Matthews* argued the cause and filed a brief for respondent Alvez. *Peter M. Pryor* and *William M. Kimball* filed a brief for respondent Joseph Vinal Ship Maintenance, Inc.

MR. JUSTICE BRENNAN announced the judgment of the Court and delivered an opinion, in which MR. JUSTICE WHITE, MR. JUSTICE BLACKMUN, and MR. JUSTICE STEVENS joined.

*Sea-Land Services, Inc.* v. *Gaudet,* 414 U. S. 573 (1974), held that under the nonstatutory maritime wrongful-death action fashioned by *Moragne* v. *States Marine Lines,* 398 U. S. 375 (1970), the widow of a longshoreman *mortally* injured aboard a vessel in state territorial waters could recover damages for the loss of her deceased husband's "society." [1] The

---

[1] "The term 'society' embraces a broad range of mutual benefits each family member receives from the others' continued existence, including love, affection, care, attention, companionship, comfort, and protection." *Sea-Land Services, Inc.* v. *Gaudet,* 414 U. S., at 585.

question in this case is whether general maritime law authorizes the wife of a harbor worker injured *nonfatally* aboard a vessel in state territorial waters to maintain an action for damages for the loss of her husband's society. We conclude that general maritime law does afford the wife such a cause of action.

I

Respondent Gilberto Alvez lost an eye while working as a lasher aboard petitioner's vessel SS *Export Builder* in New York waters. He commenced an action for damages against petitioner in the New York Supreme Court on grounds of negligence and unseaworthiness.[2] Leave to amend respondent's complaint to add his spouse as a plaintiff for loss of society was denied by the New York Supreme Court, Special Term, on the authority of *Igneri* v. *Cie. de Transports Oceaniques*, 323 F. 2d 257 (CA2 1963), cert. denied, 376 U. S. 949 (1964), in which the Court of Appeals for the Second Circuit ruled that an injured longshoreman's wife was not entitled to compensation for loss of her husband's society. App. to Pet. for Cert. A1. The Appellate Division of the New York Supreme Court reversed, and granted Alvez' motion to amend, reasoning that *Gaudet*, rather than *Igneri*, was controlling authority. 59 App. Div. 2d 883, 399 N. Y. S. 2d 673 (1st Dept. 1977). Upon certification (App. to Pet. for Cert. A6–A7), the New York Court of Appeals agreed that the vitality of *Igneri* had been sapped by *Gaudet* and by other developments in the law, and held that Mrs. Alvez should be permitted to maintain her claim for loss of society under maritime law. 46 N. Y. 2d 634, 389 N. E. 2d 461 (1979).[3] We granted certiorari. 444 U. S. 924 (1979). We affirm.

---

[2] Alvez' injury was sustained before the effective date of the 1972 Amendments to the Longshoremen's and Harbor Workers' Compensation Act, 33 U. S. C. § 901 *et seq.* Petitioner also impleaded Alvez' employer, Joseph Vinal Ship Maintenance, Inc., for indemnification.

[3] Since *Gaudet*, one Federal Court of Appeals has expressly aligned itself with the *Igneri* rule, *Christofferson* v. *Halliburton Co.*, 534 F. 2d 1147

## II

At oral argument, the Court raised, *sua sponte,* the question whether this case fell within the Court's statutory jurisdiction to review "[f]inal judgments or decrees rendered by the highest court of a State in which a decision could be had. . . ." 28 U. S. C. § 1257.

The question is a close one. The New York Court of Appeals order granting leave to amend the complaint was only the predicate to a decision on the merits of the claim for loss of society; that order, therefore, is not "final" in the strict sense of a decree that leaves nothing further to be addressed by the state courts. Nor does the Court of Appeals judgment, as originally entered, readily fit into any of the categorical exceptions to strict finality which the Court has developed in construing § 1257. See *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469, 476–487 (1975).[4] Thus, were the case in the posture in which it stood when the petition for certiorari was filed, we might well determine that the judgment lacked sufficient characteristics of finality to warrant an assertion of our appellate jurisdiction.

Since the writ of certiorari was granted, however, this case—including the claim for loss of society—has been tried, and respondent Alvez has prevailed. Tr. of Oral Arg. 7–8. Counsel for petitioner American Export Lines has informed the Court at oral argument that petitioner's appeal from the trial verdict against it will not challenge that element of the verdict which awarded damages for loss of society to Mrs.

---

(CA5), rehearing en banc denied, 542 F. 2d 1174 (1976), and a number of state and federal district courts have divided on the issue, compare, *e. g., Pesce* v. *Summa Corp.,* 54 Cal. App. 3d 86, 126 Cal. Rptr. 451 (1975), and *Giglio* v. *Farrell Lines, Inc.,* 424 F. Supp. 927 (SDNY 1977), appeal denied, No. 77–8014 (CA2, Feb. 17, 1977), with *Davidson* v. *Schlussel Reederei KG,* 295 So. 2d 700 (Fla. App. 1974), and *Westcott* v. *McAllister Bros., Inc.,* 463 F. Supp. 1039 (SDNY 1978).

[4] See Note, The Finality Rule for Supreme Court Review of State Court Orders, 91 Harv. L. Rev. 1004 (1978).

Alvez. *Id.*, at 10, 41–42.[5] Furthermore, it is conceded that no federal question, except that which we are now asked to resolve, remains in the litigation. *Id.*, at 6.[6]

---

[5] "Question: Mr. Carr [attorney for petitioner], what happens if the appellate division reverses?

"Mr. Carr: If the appellate division reverses, it would not reverse on the question of Juanita Alvez's claim for consortium. If the appellate division reverses, it would probably reverse on—

"Question: Correct.

"Mr. Carr: —instructions to the jury that may have been—

"Question: Then the appellate division leaves that intact, the $50,000, right?

"Mr. Carr: Yes, sir.

.      .      .      .      .

"Question: Could I ask you if the New York court system has finally disposed of this federal issue of the right of the wife?

"Mr. Carr: The New York state court system has finally disposed of the issue of the right of the wife.

"Question: You have lost at trial?

"Mr. Carr: Well, I don't like to put it that way.

"Question: Well, judgment has gone against you, your client?

"Mr. Carr: There is judgment against my client. . . .

"Question: Well, on the consortium issue the judgment has gone against your client?

"Mr. Carr: Yes, indeed it has, Your Honor.

"Question: And that issue has not—if you want to appeal in the state court system, the right of the wife is not subject to relitigation, is it?

"Mr. Carr: The right of the wife is final as far as the New York state court system is concerned.

"Question: Except as to amount, I suppose.

"Mr. Carr: Except as to amount.

"Question: Conceivably a reviewing court might reduce it.

"Mr. Carr: With respect to excessiveness, that is so. But as far as the wife's right of consortium, that right is final in the state courts and cannot be relitigated in that forum.

.      .      .      .      .

"Mr. Carr: The appellate division would say this is res judicata, this has been decided by the New York state Court of Appeals and does not permit you to pursue the matter further."

[6] The dissent argues, *post*, at 287, n. 1, that petitioner's counsel's assertion that the New York courts would not reverse Mrs. Alvez' trial victory,

So far as respondent's wife's claim for loss of society is concerned, it thus appears that "the federal issue, finally decided by the highest court in the State, will survive and require decision regardless of the outcome of future state-court proceedings." *Cox Broadcasting, supra,* at 480; see *Radio Station WOW* v. *Johnson,* 326 U. S. 120, 123–127 (1945). As a practical matter, then, we conclude that the judgment below upholding the legal tenability of Mrs. Alvez' claim falls— at present—within a categorical exception to strict finality.[7] "[N]ow that the case is before us . . . the eventual costs, as all the parties recognize, will certainly be less if we now pass on the questions presented here rather than send the case back with those issues undecided." *Gillespie* v. *United States Steel Corp.,* 379 U. S. 148, 153 (1964).

## III

In *Igneri* v. *Cie. de Transports Oceaniques,* the Court of Appeals for the Second Circuit rejected the loss-of-society claim of a longshoreman's wife in a maritime personal injury

---

Tr. of Oral Arg. 10, is contradicted by statements of *respondent Alvez'* counsel indicating or implying that American Export Lines "might find some grounds for error in the record," *id.,* at 21; see *id.,* at 20. But *respondent Alvez'* counsel could have said nothing else: since he is not representing petitioner American Export Lines, respondent Alvez' attorney could hardly have conceded any element of petitioner's case in the state courts. What is relevant, then, is *petitioner's* counsel's answer to this Court that "the appellate division . . . would not reverse on the question of Juanita Alvez's claim for consortium. . . . [The New York courts] would leave it intact." *Id.,* at 10. Since American Export Lines' counsel was aware of this Court's concerns, it is fair to read this response as a concession by counsel—who was in a position to know his client's strategy in the state courts—that Mrs. Alvez' claim was no longer in jeopardy.

[7] Our ruling on finality only extends, of course, to Mrs. Alvez' claim for loss of society, since we do not understand counsel for petitioner to concede that the other claims tried are beyond challenge. The fact that these other claims are nonfinal, however, need not preclude us from considering the final determination as to Mrs. Alvez' claim. Cf. *Gillespie* v. *United States Steel Corp.,* 379 U. S. 148, 153 (1964).

action. The *Igneri* opinion was carefully constructed within the framework of then-applicable doctrines governing maritime remedies. At the time, there was no clear decisional authority sustaining a general maritime law right of recovery for loss of society. 323 F. 2d, at 265–266; compare *Savage* v. *New York, N. & H. S. S. Co.,* 185 F. 778, 781 (CA2 1911) (adopting opinion of Hough, District Judge) (dictum), with *New York & Long Branch Steamboat Co.* v. *Johnson,* 195 F. 740 (CA3 1912). It was also thought established, as *Igneri* stated, "that the damages recoverable by a *seaman's* widow suing for wrongful death under the Jones Act do not include recovery for loss of consortium," 323 F. 2d, at 266 (emphasis added); see *Michigan Central R. Co.* v. *Vreeland,* 227 U. S. 59 (1913). Too, it was far from evident that the rule of *Seas Shipping Co.* v. *Sieracki,* 328 U. S. 85 (1946), entitling a longshoreman to maintain an action for unseaworthiness, would extend to permit recovery for loss of society by his spouse. 323 F. 2d, at 267–268. Thus, the principles of maritime law prevalent in 1963 militated against, rather than supported, the creation of a right to recover for loss of society in *Igneri.*

Subsequent developments, however, have altered the legal setting within which we confront a claim for loss of society due to personal injury. In 1970, *Moragne* v. *States Marine Lines,* 398 U. S. 375, overruled *The Harrisburg,* 119 U. S. 199 (1886), and held that an action for wrongful death based upon unseaworthiness is maintainable under general federal maritime law. *Moragne* itself did not fully define the new, nonstatutory, cause of action, and its contours were further shaped some four years later by *Sea-Land Services, Inc.* v. *Gaudet,* 414 U. S. 573 (1974). *Gaudet* held, *inter alia,* that the maritime wrongful-death remedy created by *Moragne* encompassed the recovery of damages for loss of society by a decedent's widow. So, it is no longer correct to assume— as did *Igneri*—that the warranty of seaworthiness affords no relief to the spouse of a longshoreman. More importantly, *Gaudet* provides the conclusive decisional recognition of a

right to recover for loss of society that *Igneri* found lacking.

To be sure, *Gaudet* upheld a claim for loss of society in the context of a wrongful-death action. But general federal maritime law is a source of relief for a longshoreman's personal injury, *Pope & Talbot, Inc.* v. *Hawn,* 346 U. S., 406, 412–414 (1953), just as it is a source of remedy for wrongful death, *Moragne, supra.* Within this single body of judge-formulated law, there is no apparent reason to differentiate between fatal and nonfatal injuries in authorizing the recovery of damages for loss of society. The vitality of the longshoreman is logically irrelevant once we have accepted the principle that injury suffered by a longshoreman's spouse from loss of society should be compensable, when proved. Nothing intrinsic to the *Gaudet* rule, therefore, should cabin its application to wrongful death.[8]

Petitioner argues that the reach of *Gaudet*'s principle must be limited by the fact that no right to recover for loss of society due to maritime injury has been recognized by Congress under § 2 of the Death on the High Seas Act (DOHSA), 46 U. S. C. § 762; see *Mobil Oil Corp.* v. *Higginbotham,* 436 U. S. 618, 620 (1978), or the Jones Act, 46 U. S. C. § 688. But it is a settled canon of maritime jurisprudence that " 'it better becomes the humane and liberal character of proceedings in

---

[8] *Gaudet*'s discussion of the issue of double liability did state:

"[D]ecedent's recovery did not include damages for the dependents' loss of services or of society, and funeral expenses. Indeed, these losses—unique to the decedent's dependents—could not accrue until the decedent's death." 414 U. S., at 591–592.

In *Christofferson* v. *Halliburton Co.,* 534 F. 2d, at 1150, the Court of Appeals for the Fifth Circuit inferred from that passage an intention to limit *Gaudet* to the wrongful-death context. But no such limitation is implicit. As a matter of logic, *Gaudet*'s statement that double liability is precluded in wrongful-death cases is not equivalent to the proposition that *only* wrongful-death cases preclude double liability. Moreover, the *Gaudet* opinion itself noted that damages may be assessed for loss of society in personal injury cases, 414 U. S., at 589–590; see *Christofferson, supra,* at 1153–1154 (Freeman, J., dissenting).

admiralty to give than to withhold the remedy, when not required to withhold it by established and inflexible rules.' " *Moragne* v. *States Marine Lines, supra,* at 387, quoting, with approval, *The Sea Gull,* 21 F. Cas. 909, 910 (No. 12,578) (CC Md. 1865); accord, *Sea-Land Services, Inc.* v. *Gaudet, supra,* at 583. Plainly, neither statute embodies an "established and inflexible" rule here foreclosing recognition of a claim for loss of society by judicially crafted general maritime law.

DOHSA comprehends relief for *fatal* injuries incurred on the *high seas,* 46 U. S. C. § 761. To be sure, *Mobil Oil Corp.* v. *Higginbotham, supra,* construed DOHSA to forbid general maritime law supplementation of the elements of compensation for which the Act provides. But *Higginbotham* never intimated that the preclusive effect of DOHSA extends beyond the statute's ambit. To the contrary, while treating the statutory remedies for wrongful deaths on the high seas as exclusive, *Higginbotham* expressly reaffirmed that *Gaudet* governs recoveries for wrongful deaths on territorial waters. 436 U. S., at 623–625; see *Moragne, supra,* at 397–398. And if DOHSA does not pre-empt general maritime law where *fatalities* occur *within* territorial waters, it follows *a fortiori* that the Act does not exclude federal maritime law as a source of relief for *nonfatal* injuries upon the same waters.

Nor do we read the Jones Act as sweeping aside general maritime law remedies. Notwithstanding our sometime treatment of longshoremen as pseudo-seamen for certain Jones Act purposes, *International Stevedoring Co.* v. *Haverty,* 272 U. S. 50 (1926); cf. *Seas Shipping Co.* v. *Sieracki, supra,* at 100–102,[9] the Jones Act does not exhaustively or exclu-

---

[9] *Haverty* was largely, if not completely, superseded by the Longshoremen's and Harbor Workers' Compensation Act of 1927, 33 U. S. C. § 901 *et seq.* See *Swanson* v. *Marra Bros.,* 328 U. S. 1 (1946). But see G. Gilmore & C. Black, The Law of Admiralty 330, 454–455 (2d ed. 1975). *Sieracki* has been overtaken by the 1972 Amendments to the Longshoremen's Act. See Gilmore & Black, *supra,* at 449.

sively regulate longshoremen's remedies, see *Moragne,* 398 U. S., at 395–396, and n. 12; *Pope & Talbot, Inc.* v. *Hawn, supra,* at 413–414; *Igneri,* 323 F. 2d, at 266.[10]  Furthermore, the Jones Act lacks such preclusive effect even with respect to true seamen; thus, we have held that federal maritime law permits the dependents of seamen killed within territorial seas to recover for violation of a duty of seaworthiness that entails a stricter standard of care than the Jones Act. *Moragne, supra,* at 396, n. 12; see Gilmore & Black, *supra* n. 9, at 367–368.

Apart from the question of statutory pre-emption, the liability schemes incorporated in DOHSA and the Jones Act should not be accorded overwhelming analogical weight in formulating remedies under general maritime law.  The two statutes were enacted within days to address related problems—yet they are "hopelessly inconsistent with each other."  Gilmore & Black, *supra* n. 9, at 359; see *id.,* at 360–367.  The Jones Act itself was not the product of careful drafting or attentive legislative review, *id.,* at 277, 327; assuming that the statute bars damages for loss of society, it does so solely by virtue of judicial interpretation of the Federal Employers' Liability Act, 45 U. S. C. § 51 *et seq.,* which was incorporated into the Jones Act, see, *e. g., Ivy* v. *Security Barge Lines, Inc.,* 606 F. 2d 524, 526 (CA5 1979) (en banc), cert. pending, No. 79–1228. Thus, a remedial omission in the Jones Act is not evidence of considered congressional policymaking that should command

---

[10] Respondent Joseph Vinal Ship Maintenance, Inc., the interests of which parallel petitioner's, has advanced the argument that recovery for loss of society is barred by the Longshoremen's and Harbor Workers' Compensation Act as applicable at the time of the injury—*i. e.,* before the 1972 Amendments.  It does not appear that this contention was raised below; in any event, it has no merit.  Whatever the limitations on recovery against employers under the pre-1972 LHWCA, longshoremen retained additional rights based upon the warranty of seaworthiness. See *Seas Shipping Co.* v. *Sieracki,* 328 U. S. 85 (1946); cf. *Sea-Land Services, Inc.* v. *Gaudet, supra.*

our adherence in analogous contexts. And we have already indicated that "no intention appears that the [Death on the High Seas] Act have the effect of foreclosing any nonstatutory federal remedies that might be found appropriate to effectuate the policies of general maritime law." *Moragne, supra,* at 400; *Gaudet,* 414 U. S., at 588, n. 22.

Far more persuasive at the present juncture are currently prevailing views about compensation for loss of society. Cf. *Sea-Land Services, Inc.* v. *Gaudet, supra,* at 587–588. As the Court of Appeals observed in *Igneri:*

> "At least this much is true. If the common law recognized a wife's claim for loss of consortium, uniformly or nearly so, a United States admiralty court would approach the problem here by asking itself why it should not likewise do so. . . ." 323 F. 2d, at 260.

At the time *Igneri* was decided, governing law in the relevant jurisdictions was substantially divided over the wife's right to recover for loss of consortium. *Id.,* at 260–264. But the state of the law is very different today. Currently, a clear majority of States permit a wife to recover damages for loss of consortium from personal injury to her husband.[11] Fur-

---

[11] Forty-one States and the District of Columbia allow recovery by a wife or couple: *Swartz* v. *United States Steel Corp.,* 293 Ala. 439, 304 So. 2d 881 (1974); *Schreiner* v. *Fruit,* 519 P. 2d 462 (Alaska 1974); *Glendale* v. *Bradshaw,* 108 Ariz. 582, 503 P. 2d 803 (1972); *Missouri Pacific Transp. Co.* v. *Miller,* 227 Ark. 351, 299 S. W. 2d 41 (1957); *Rodriguez* v. *Bethlehem Steel Corp.,* 12 Cal. 3d 382, 525 P. 2d 669 (1974); Colo. Rev. Stat. § 14–2–209 (1973); *Hopson* v. *St. Mary's Hospital,* 176 Conn. 485, 408 A. 2d 260 (1979); *Yonner* v. *Adams,* 53 Del. 229, 167 A. 2d 717 (1961); *Hitaffer* v. *Argonne Co.,* 87 U. S. App. D. C. 57, 183 F. 2d 811 (1950); *Gates* v. *Foley,* 247 So. 2d 40 (Fla. 1971); *Brown* v. *Georgia-Tennessee Coaches, Inc.,* 88 Ga. App. 519, 77 S. E. 2d 24 (1953); *Nishi* v. *Hartwell,* 52 Haw. 188, 473 P. 2d 116 (1970); *Nichols* v. *Sonneman,* 91 Idaho 199, 418 P. 2d 562 (1966); *Dini* v. *Naiditch,* 20 Ill. 2d 406, 170 N. E. 2d 881 (1960); *Troue* v. *Marker,* 253 Ind. 284, 252 N. E. 2d 800 (1969); *Acuff* v. *Schmit,* 248 Iowa 272, 78 N. W. 2d 480 (1956); Kan. Stat. Ann. § 23–205 (Supp. 1979); *Kotsiris* v. *Ling,* 451 S. W. 2d

thermore, even in *Igneri*'s day, the generally accepted rule allowed a *husband* to gain damages for loss of consortium with his tortiously injured *wife, id.*, at 260; so "clearly authorized" a common-law principle would have been translated into maritime law by the *Igneri* analysis, *id.*, at 260, 267. And if *Igneri* implies that a husband may collect compensation under maritime law for loss of consortium with his injured wife, it follows that the same relief is due the wife who suffers a comparable loss because of wounds suffered by her husband, see, *e. g., Duncan* v. *General Motors Corp.*, 499 F. 2d 835 (CA10 1974); cf. *Orr* v. *Orr*, 440 U. S. 268 (1979).

Admiralty jurisprudence has always been inspirited with a "special solicitude for the welfare of those men who under[take] to venture upon hazardous and unpredictable sea voyages." *Moragne* v. *States Marine Lines, supra,* at 387. As in *Moragne* and *Gaudet*, "[o]ur approach to the

---

411 (Ky. 1970); Me. Rev. Stat. Ann., Tit. 19, § 167–A (Supp. 1979); *Deems* v. *Western Maryland R. Co.*, 247 Md. 95, 231 A. 2d 514 (1967); *Diaz* v. *Eli Lilly & Co.*, 364 Mass. 153, 302 N. E. 2d 555 (1973); *Montgomery* v. *Stephan*, 359 Mich. 33, 101 N. W. 2d 227 (1960); *Thill,* v. *Modern Erecting Co.*, 284 Minn. 508, 170 N. W. 2d 865 (1969); Miss. Code Ann. § 93-3-1 (1972); *Novak* v. *Kansas City Transit, Inc.*, 365 S. W. 2d 539 (Mo. 1963); *Duffy* v. *Lipsman-Fulkerson & Co.*, 200 F. Supp. 71 (Mont. 1961) (applying Montana law); *Luther* v. *Maple*, 250 F. 2d 916 (CA8 1958) (applying Nebraska law) (semble); *General Electric Co.* v. *Bush*, 88 Nev. 360, 498 P. 2d 366 (1972); N. H. Rev. Stat. Ann. § 507:8–a (1968); *Ekalo* v. *Constructive Serv. Corp.*, 46 N. J. 82, 215 A. 2d 1 (1965); *Millington* v. *Southeastern Elevator Co.*, 22 N. Y. 2d 498, 239 N. E. 2d 897 (1968); *Clouston* v. *Remlinger Oldsmobile Cadillac, Inc.*, 22 Ohio St. 2d 65, 258 N. E. 2d 230 (1970); Okla. Stat., Tit. 32, § 15 (Supp. 1979); Ore. Rev. Stat. § 108.010 (1975); *Hopkins* v. *Blanco*, 457 Pa. 90, 320 A. 2d 139 (1974); *Mariani* v. *Nanni*, 95 R. I. 153, 185 A. 2d 119 (1962); *Hoekstra* v. *Helgeland*, 78 S. D. 82, 98 N. W. 2d 669 (1959); Tenn. Code Ann. § 25-109 (Supp. 1979); *Whittlesey* v. *Miller*, 572 S. W. 2d 665 (Tex. 1978); Vt. Stat. Ann., Tit. 12, § 5431 (Supp. 1979); W. Va. Code § 48-3-19a (1976); *Moran* v. *Quality Aluminum Casting Co.*, 34 Wis. 2d 542, 150 N. W. 2d 137 (1967). See also *Sea-Land Services, Inc.* v. *Gaudet*, 414 U. S., at 587; see generally W. Prosser, Law of Torts 895-896 (4th ed. 1971).

resolution of the issue before us . . . [is] consistent with the extension of this 'special solicitude' to the dependents of [seafarers]. . . ." *Gaudet, supra,* at 577. The decision of the New York Court of Appeals is

*Affirmed.*

THE CHIEF JUSTICE concurs in the judgment.

MR. JUSTICE POWELL, concurring in the judgment.

I continue to believe that *Sea-Land Services, Inc.* v. *Gaudet,* 414 U. S. 573, 595 (1974) (POWELL, J., dissenting), was decided wrongly, but I recognize the utility of *stare decisis* in cases of this kind, *id.,* at 596. Since I see no rational basis for drawing a distinction between fatal and nonfatal injuries, I join in the judgment of the Court.

MR. JUSTICE MARSHALL, with whom MR. JUSTICE STEWART and MR. JUSTICE REHNQUIST join, dissenting.

After certiorari has been granted, and a case has been briefed and argued, there is an inevitable pressure to decide it, especially when the argument for a dismissal is based on the seemingly technical requirements of finality. In this case, however, it is plain to me that the decision below is not final, and that the Court is therefore without jurisdiction to review it under 28 U. S. C. § 1257.

Respondent Gilberto Alvez brought suit against petitioner in the New York Supreme Court for injuries incurred during the course of his employment on petitioner's vessel. He moved to amend the complaint to add his spouse, Juanita Alvez, as a plaintiff. His motion was denied. The Appellate Division of the New York Supreme Court reversed, and the New York Court of Appeals affirmed the decision of the Appellate Division. This Court granted certiorari to review the decision of the New York Court of Appeals.

After certiorari had been granted, and while the case was being briefed in this Court, the litigants proceeded to try the

case in the New York Supreme Court. Two weeks before the case was argued here, Gilberto Alvez received a jury verdict against petitioner in the sum of $500,000, and Juanita Alvez received $50,000. In oral argument before this Court, counsel for petitioner indicated that petitioner is appealing the judgment on grounds of improper jury instructions.[1] If petitioner's appeal is successful, it seems plain that both verdicts will be reversed.

In these circumstances, I am unable to accept the Court's conclusion that the decision below is final. Nothing in the record before us supports the suggestion that " 'the federal issue, finally decided by the highest court in the State, will survive and require decision regardless of the outcome of future state-court proceedings.' " *Ante,* at 279, quoting *Cox Broadcasting Corp.* v. *Cohn,* 420 U. S. 469, 480 (1975). The federal issue may neither survive nor require decision if peti-

---

[1] In oral argument counsel for petitioner stated that the Appellate Division may "reverse on . . . instructions to the jury. . . ." Tr. of Oral Arg. 10. I see no basis for the suggestion that "petitioner's appeal from the trial verdict against it will not challenge that element of the verdict which awarded damages for loss of society to Mrs. Alvez." *Ante,* at 277-278. In context it seems plain that counsel's comments on the award to Juanita Alvez were designed to indicate that there was no *separate* appeal with respect to the award on her behalf. But there was no suggestion that petitioner is not challenging the determination of liability as to Mr. Alvez, from whose award his spouse's is wholly derivative. The assertion that Juanita Alvez' award is final is contradicted by the suggestion of counsel for respondent Alvez that "if there is a problem," the parties might "[w]aive any right to appeal as far as the decision, as far as the judgment for Juanita Alvez is concerned below." Tr. of Oral Arg. 20. Counsel conceded that, in the absence of such a waiver, "there is always the possibility that the defendant in this case might find some grounds for error in the record." *Id.,* at 21. The offer of a waiver of appellate rights and the concession that "some grounds for error" might be found are difficult to reconcile with the suggestion that further state-court proceedings cannot affect the award to Juanita Alvez. At the very least, the comments of counsel are highly ambiguous, and it seems odd for the plurality to indulge in very possibly incorrect speculations on the point when jurisdictional prerequisites are at stake.

tioner is successful in future state-court proceedings. Therefore, the finality requirement of § 1257 precludes us from deciding the case. Cf. *Southern Pacific Co.* v. *Gileo,* 351 U. S. 493 (1956); *Republic Natural Gas Co.* v. *Oklahoma,* 334 U. S. 62 (1948).

Even if I were to accept the unfounded premise that the federal issue will necessarily survive, I would not agree that the order of the New York Court of Appeals was rendered final by developments subsequent to the grant of certiorari. The plurality apparently concedes that when we granted certiorari, the New York Court of Appeals' order allowing leave to amend was not appealable. *Ante,* at 277. After that order was entered, the procedural posture of the case was the same as if the trial court had granted leave to amend in the first place. Such an order would not, of course, have been final; in the plurality's own words, it "was only the predicate to a decision on the merits of the claim for loss of society." *Ibid.* If this reasoning is correct, I do not believe that a subsequent trial—conducted *after we have granted certiorari*—can vest jurisdiction in this Court. I have been unable to find any case, and the plurality points to none, that supports the apparent adoption of a contrary rule. Indeed, our cases appear uniformly to assume that finality is determined as of the time that certiorari is sought. See *Department of Banking* v. *Pink,* 317 U. S. 264, 268 (1942).[2]

For three reasons, the plurality's conclusion to the contrary strikes me as fundamentally misguided. First, it sanctions the practice of granting certiorari to review nonfinal orders, and thus treats the finality requirement as merely a policy to be considered in deciding whether we should resolve a dis-

---

[2] On occasion, of course, subsequent events can *deprive* the Court of jurisdiction over a case, as for example by rendering it moot. For reasons discussed in the text, however, I see no justification, either in precedent or in principle, for the view that subsequent events can justify a grant of certiorari to review a decision over which the Court had no jurisdiction in the first instance.

pute. The finality requirement, of course, is no such thing; it determines whether we have the power to render a decision. Jurisdictional prerequisites cannot be disregarded simply because it seems more economical for the Court to decide the case. Second, it encourages litigants to seek review of non-final judgments in the hope that subsequent events will render them final. Such a practice only retards the speedy resolution of disputes and multiplies the burdens of litigation. Finally, and most disturbing, today's decision encourages litigants and lower courts to proceed to try a case in which this Court has granted certiorari and which is simultaneously being briefed and argued in this Court. That result cannot easily coexist with one of the basic principles on which our judicial system is premised, that two courts cannot have jurisdiction over the same case at the same time. See 9 J. Moore, B. Ward, & J. Lucas, Moore's Federal Practice § 203.11 (1975), and cases cited. The necessity for adhering to that rule in these circumstances is plainly suggested by the waste of judicial resources that would result if the Court decided to reverse the Court of Appeals and thus to render the trial court proceedings with respect to Juanita Alvez a complete nullity.

It should always be remembered that the "considerations that determine finality . . . have reference to very real interests—not merely those of the immediate parties but, more particularly, those that pertain to the smooth functioning of our judicial system." *Republic Natural Gas Co.* v. *Oklahoma, supra,* at 69. Accordingly, the Court's salutary adoption of a "practical rather than a technical construction" of the finality requirement, *Cohen* v. *Beneficial Loan Corp.,* 337 U. S. 541, 546 (1949), is not a license for ignoring the requirement entirely, or for interpreting it without regard for its legitimate underlying purposes. The finality requirement "serves several ends: (1) it avoids piecemeal review of state court decisions; (2) it avoids giving advisory opinions in cases where there may be no real 'case' or 'controversy' in

the sense of Art. III; (3) it limits review of state court determinations of federal . . . issues to leave at a minimum federal intrusion in state affairs." *North Dakota Pharmacy Bd.* v. *Snyder's Stores,* 414 U. S. 156, 159 (1973). See also *Republic Natural Gas Co.* v. *Oklahoma, supra; Radio Station WOW* v. *Johnson,* 326 U. S. 120, 123–124 (1945). All of these purposes may be jeopardized by the decision today. We can have no assurance that there are not other federal issues in the case that will reach the Court at some point in the future. The decision the Court announces may be entirely advisory if the appellate courts in New York rule in favor of the petitioner. And principles of federalism counsel against reviewing the decision of the New York courts prematurely and without any necessity for doing so.

In my view, the proper disposition in these circumstances would be to dismiss the writ of certiorari as improvidently granted, and to permit the state courts to resolve the pending appeal. If the federal question still survives after the judgment of the highest state court becomes final, petitioner may again seek a writ of certiorari to review that judgment. I dissent.