William A. **WEILAND**

v.

**PYRAMID VENTURES GROUP et al.**

Civ. A. No. 76–5–A.

United States District Court,
M. D. Louisiana.

Jan. 28, 1981.

On Motions To Amend April 2, 1981.

Charles R. Moore, Moore & Walters, Baton Rouge, La., for plaintiff, William A. Weiland.

Gerard T. Gelpi and Cliffe F. Laborde, Gelpi, Sullivan, Carroll & Laborde, New Orleans, La., for defendant, West of Eng., Shipowners Mut. Protection & Indem. Assoc.

Andrew T. Martinez, Terriberry, Carroll, Yancey & Farrell, New Orleans, La., for defendant, Empressa Lineas Maritimas Argentinas.

Paul A. Nalty and Roderick McFaull, New Orleans, La., for defendants, Creole Lines, Inc., and Pyramid Marine Inc.

Don L. Broussard, Lafayette, La., for intervenor, Travelers Ins. Co.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JOHN V. PARKER, Chief Judge.

This is an action for damages for personal injuries arising from the loading of the M/V PYRAMID VENUS at a wharf owned by Allied Chemical Company ("Allied") on the Mississippi River at Baton Rouge, Louisiana. Plaintiff, William A. Weiland, has sued the owner of the vessel, Creole Lines, Inc. ("Creole"); the operating manager, Pyramid Marine, Inc. ("Marine"); the agent of the owner, Pyramid Ventures Group, Inc. ("Ventures"); the time charterer, Empressa Lineas Maritimas Argentinas ("ELMA"); and the protection and indemnity insurer of the vessel, West of England Shipowners Mutual Indemnity Corporation ("West of England").

This matter was originally tried on May 12, 1980, and because of the decision of the Supreme Court in *American Export Lines, Inc. v. Alvez*, 446 U.S. 274, 100 S.Ct. 1673, 64 L.Ed.2d 284 (1980), it was reopened by this Court to allow Mrs. Weiland to become a plaintiff and to claim damages for loss of consortium. The matter was resubmitted on September 2, 1980. After careful consideration of the evidence presented and the numerous briefs filed by the parties, the Court enters the following findings of fact and conclusions of law.

*Findings of Fact*

(1) Plaintiff was injured on April 15, 1975, while employed as a general foreman for Allied. Plaintiff was in charge of soda ash loading of railroad cars, trucks and vessels at the Allied plant. Allied made more frequent shipments by rail and truck than by water. Approximately two vessels a month were loaded at the Allied docks. While plaintiff spent most of his time in the office, his duties often required him to go to the wharf and board vessels being loaded there. On April 12, 1975, the M/V PYRAMID VENUS, a 10,800 gross ton vessel of Bahamian registry and 518 feet in length, docked at the Allied facility on the river.

(2) On the day of the accident, April 15, 1975, the vessel was taking on a load of soda ash. The wharf consisted of a floating middle section and fixed end sections and was 606 feet in overall length. The floating middle section was 295 feet long, the upriver section was about 200 feet long and the downriver section only about 35 feet long. There were, of course, gangways between the end sections and the center. Allied had a permanent conveyor system leading onto the dock which had a loading arm in a fixed position about midway along the dock. Consequently, to load several holds, the vessel would have to shift positions along the dock.

(3) When the vessel arrived, the river was in flood stage and both fixed end sections of the wharf were under water. The bollards were at least two inches under water. Allied had attached semi-permanent mooring lines to bollards on the end sections which ran to the center section for use during flood stage. The net effect of the high water was that the 518-foot long ship had to moor at the floating center section, which was only 295 feet in length. The current was well above normal, estimated by the master of the M/V PYRAMID VENUS, Captain Hiram W. Yap, at six to seven knots. Because of the strong current and flood conditions, the master refused to load cargo until a tug was pro-

vided for continuous assistance to the vessel in shifting operations.

(4) Plaintiff boarded the M/V PYRAMID VENUS on the day of the accident to ascertain progress on loading the vessel. After about ten minutes, plaintiff went back to the wharf and began conversing with Howard Miller, a marine loader employed by Allied who operated the conveyor system used to load the soda ash aboard vessels. Plaintiff told Miller that he had never seen a self-unloader like that in the stern of the M/V PYRAMID VENUS and thought that it was "unique." Deciding to examine the self-unloader, they moved to a position on the dock where they could get a closer look. This position was near one of the bollards which secured one of two aft spring lines of the vessel. After they had been observing the self-unloader for a few minutes, the vessel began moving forward in order that the No. 4 low hatch could be loaded. Miller immediately noticed that the vessel was beginning to shift positions and began walking back to the loading spout. Miller testified that when he realized the vessel was moving he started back to his work station in order to resume loading operations; he stated that he was not aware of any potential danger from use of lines to shift the vessel. Plaintiff heard a rope squeak and realized that there was tension on the spring lines. He began walking upriver and away from the line, but he only got five or six steps away when the aft spring line parted and struck him from behind causing him to land on the dock. Miller, who was about ten steps ahead of plaintiff, had gotten far enough away to escape injury.

(5) The Mississippi River was very high that day (41.5 feet), causing the current to be swifter than usual as previously noted. In order to shift the vessel, the crew heaved upon the two head lines and the two aft spring lines. The position of the vessel along the dock was such that most of the stress was placed upon the aft spring lines rather than upon both the head lines and the aft spring lines. While the tug was available to assist in shifting the vessel, the first officer decided not to use it because the shift was only about 25 feet. The tug could have been used to take some of the pressure off the aft spring lines, and the captain of the tug stated that he would have responded immediately to a call.

(6) Even under normal conditions, lines often break when vessels attempt to shift using their lines. In fact, on the day before the accident, one of the stern lines furnished by Allied parted when the vessel shifted.

(7) The loading process necessarily involves a coordinated effort between Allied dock workers and the ship's crew. However, decisions as to which hold to load next and exactly when the vessel will shift were made solely by the vessel. Miller and plaintiff were told by some member of the crew that the vessel would be shifting again but were not informed concerning how long it would be before the shift would take place, nor that the ship's crew would not use the tug. Miller did not think that it would be as soon as it was or he would not have left his position at the loading spout since his job required him to be ready to tell the ship when to stop. Plaintiff also testified that he knew that the vessel was going to make another shift but that he did not know when this would be. Plaintiff stated that he was not sure whether he was informed of this by Miller or by one of the members of the crew. Plaintiff also testified that he knew that lines were under strain when used to shift a vessel and that it was not a good idea to be around them when a vessel shifts. He stated that he simply hung around too long.

(8) Persons standing on the dock could have been seen by the ship's officers who were in charge of the shifting maneuver. While there is no evidence as to whether anyone aboard the ship actually saw plaintiff and Miller on the dock, the second officer saw plaintiff immediately after he heard the line part, and the Court finds that he could have seen plaintiff on the wharf near the lines had he looked. No member of the crew gave any warning of any sort prior to shifting the vessel. Shift-

ing a large ship by its own lines is a hazardous maneuver under all circumstances, but that shift was especially dangerous because of the high water, the swift current and the peculiarities of the Allied docking facility.

(9) After the accident, plaintiff was taken to Baton Rouge General Hospital and treated by Dr. Alan Farries, an orthopedic surgeon. Plaintiff complained of pain in his right shoulder, lower back and knee. X-rays were taken and revealed that plaintiff had received a fracture and dislocation of the right shoulder. X-rays of plaintiff's back and left knee were negative. Plaintiff underwent open reduction and internal fixation of his shoulder shortly after being admitted to the hospital.

Plaintiff was in the hospital for about a week. During this period, he experienced heart trouble (tachycardia and cardial spasms) and low back pain. Since leaving the hospital, plaintiff has had no further problems with his heart.

(10) After being released from the hospital, plaintiff continued to see Dr. Farries. Plaintiff experienced significant loss of motion of his right shoulder. On January 4, 1976, plaintiff was readmitted to Baton Rouge General Hospital for closed manipulation of the shoulder. An x-ray of his right knee was taken the next day, which showed a small spur off the articular surface of the tibia anterior to the tibial spine region.

After the operation, plaintiff still experienced pain and loss of motion in relation to his right shoulder. In December, 1977, Dr. Farries reported that plaintiff had been complaining of lower back pain for at least eighteen months and that plaintiff complained of pain and popping in his knees. Dr. Farries found a moderate degree of chondromalacia in his knees. Dr. Farries recommended that plaintiff retire because of his back, knee and shoulder problems.

(11) In November of 1978, Dr. Farries diagnosed permanent disability of the shoulder at 40–45 percent, disability of the back at 20 percent, and disability of the right knee at 10 percent. In April of 1980, Dr. Farries diagnosed permanent disability of the right shoulder at 50–60 percent, permanent disability of the lower back at 25–30 percent, and permanent disability of the right knee at 10 percent and the left knee at 5 percent.

Plaintiff was a long-time (25-year) employee and Allied kept him on "light duty" at substantially the same pay despite the fact that his position was abolished while he was off work. Plaintiff continued working on "light duty" until January 16, 1978, when his position, along with others, was abolished in some sort of corporate restructuring. Since then plaintiff has drawn disability payments under the Longshoremen's and Harbor Workers' Act.

■ At trial, Dr. Farries testified that plaintiff's back and shoulder problems were definitely related to the accident. Dr. Farries further testified that his knee problem was probably related to the accident. In the absence of any contrary medical evidence, the Court finds that plaintiff's lower back, right shoulder and knee problems were all caused by the accident.

(12) Plaintiff has suffered severe pain in his back, shoulder and knee. The shoulder injury is the most serious; it continues to cause substantial pain and there is permanent limited motion.

(13) Plaintiff attempted to return to work on "light duty," mostly clerical work since he could not walk, stoop, bend, lift or engage in any strenuous physical activity. He found even "light duty" to be physically beyond his capacity.

■ (14) The evidence preponderates to the effect that because of his injuries and age plaintiff is not capable of returning to the labor market.

(15) Plaintiff has experienced significant loss of motion of his right arm as a result of the accident. This has kept him from doing many things that he previously enjoyed doing, such as bowling, volleyball, traveling, camping, repairing his house and gardening. It has also made it difficult for him to do everyday tasks such as shaving and lifting things. It is also apparent that plaintiff

has experienced much pain and discomfort as a result of his injuries.

(16) Mrs. Weiland testified that they have done less socializing and are restricted in their church and camping activities in which they frequently participated before her husband's accident. She also described plaintiff's frustration at no longer being able to perform the tasks and amusements that he formerly enjoyed. She testified that they have been married for thirty years and that plaintiff was always very active and a hard worker before the accident but that now he is always tired, frequently in pain, and has curtailed almost all of his former activities.

## Conclusions of Law

■ (1) The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1333 and 46 U.S.C. § 740. Plaintiff's claims fall within the scope of the Longshoremen's and Harbor Workers' Compensation Act. Plaintiff was not a longshoreman but he was injured on a dock while engaged in maritime employment, 33 U.S.C. §§ 903, 902(3); *P.C. Pfeiffer Co., Inc. v. Ford*, 444 U.S. 69, 100 S.Ct. 328, 62 L.Ed.2d 225 (1979). Accordingly, plaintiff brings his claims under Section 905(b) of the Act, which, *inter alia*, provides:

"In the event of injury to a person covered under this Chapter caused by the negligence of a vessel, then such person, or anyone otherwise entitled to recover damages by reason thereof, may bring an action against such vessel as a third party.... The liability of the vessel under this subsection shall not be based upon the warranty of seaworthiness or a breach thereof at the time the injury occurred ...."

The term "vessel" is defined by the Act as follows:

"The term 'vessel' means any vessel upon which or in connection with which any person entitled to benefits under this act suffers injury or death arising out of or in the course of his employment, and said vessel's owner, owner pro hac vice, agent, operator, charterer, master, officer, or crew member."

■ (2) The Fifth Circuit has established that negligence under the Longshoremen's and Harbor Workers' Compensation Act is to be determined by analogy to land-based law concepts and that the Restatement (Second) of Torts should be referred to as a guideline, *Gay v. Ocean Transport & Trading, Ltd.*, 546 F.2d 1233 (5th Cir. 1977). In *Gay*, the Court specifically refers to Sections 342, 343 and 343A[1] of the Restatement as the general standards which should be utilized to assure uniformity in cases brought under Section 905(b).

1. Section 342 provides:
"A possessor of land is subject to liability for physical harm caused to licensees by a condition on the land if, but only if,
"(a) the possessor knows or has reason to know of the condition and should realize that it involves an unreasonable risk of harm to such licensees, and should expect that they will not discover or realize the danger, and
"(b) he fails to exercise reasonable care to make the condition safe, or to warn the licensees of the condition and the risk involved, and
"(c) the licensees do not know or have reason to know of the condition and the risk involved."
Section 343 states:
"A possessor of land is subject to liability for physical harm caused to his invitees by a condition on the land if, but only if, he
"(a) knows or by the exercise of reasonable care would discover the condition, and should realize that it involves an unreasonable risk of harm to such invitees, and
"(b) should expect that they will not discover or realize the danger, or will fail to protect themselves against it, and
"(c) fails to exercise reasonable care to protect them against danger."
Section 343A continues:
"(1) A possessor of land is not liable to his invitees for physical harm caused to them by any activity or condition on the land whose danger is known or obvious to them, unless the possessor should anticipate the harm despite such knowledge or obviousness.
"(2) In determining whether the possessor should anticipate harm from a known or obvious danger, the fact that the invitee is entitled to make use of public land, or of the facilities of a public utility, is a factor of importance indicating that the harm should be anticipated."

■ (3) The Court finds that the master and officers of the vessel knew or should have known that anyone near the aft spring lines of the vessel when the vessel began to shift would be in danger. Several factors present that day—the swift current, the position of the vessel in relation to the dock and the fact that the vessel was to shift without the assistance of a tug—should have made the master and officers of the vessel aware of the fact that substantial stress would be placed on the aft spring lines.[2] Therefore, it was foreseeable that an aft spring line would part and that anyone on the dock near the lines would face an unreasonable risk of harm.

The Court also finds that the officers on deck should have known whether anyone was on the dock near the lines when the vessel started to shift. While Allied personnel were generally informed that the vessel would shift, they were not told when the shift would actually take place. Under these circumstances, it could reasonably be anticipated that plaintiff or some other person would be on the wharf when the operation began unless the crew issued a warning. Consequently, the Court finds that the vessel failed to exercise reasonable care by failing to see plaintiff and warn him that the ship was about to move. A warning of such a hazardous operation would have been a reasonable precaution under all of the circumstances involved, and the vessel had a duty to exercise reasonable care to avoid injury to persons who could reasonably be expected to be in the vicinity. Furthermore, the Court finds that Section 343A of the Restatement does not apply because the condition was not a known or obvious danger since plaintiff did not know, and it was not obvious, when the shift would take place, nor was the extent of danger obvious to plaintiff. While the ship's crew is fully familiar with the hazards involved in shifting a large vessel under the conditions then prevailing (as Captain Yap himself noted in his demand for a tug), persons who have as little exposure to maritime employment as plaintiff would not have such complete knowledge.

The mere fact that an operation aboard a ship presents hazards does not, of course, preclude the operation, but the crew is charged with the duty of exercising reasonable care. Here, the plaintiff, in a position of danger, was in plain view of the second officer who was on deck assisting the first officer in supervising the movement of the ship. It would have been a simple matter to warn plaintiff (as well as Miller) to move from a position of danger. In any event, the vessel has a duty to take reasonable steps to warn those whose presence might be reasonably anticipated and who would be endangered by the shift prior to undertaking such a hazardous operation.

■ (4) Defendants all strenuously argue that plaintiff was contributorily negligent and that his injury was caused in part by his own inattention. While it is correct that plaintiff had been informed that the vessel would undertake a shifting operation "soon," he was not informed concerning precisely when the operation would begin, nor did he have any duties relating to the shift. He was properly upon the property of his employer and he was entitled to assume that the crew of the vessel would warn him to move before they began an operation that would endanger him. Plaintiff was not contributorily negligent.

■ (5) Counsel for plaintiff argues that plaintiff is entitled to recover from ELMA, the time charterer, because ELMA breached its duty to provide a safe berth. The Court considers this argument akin to a claim for unseaworthiness, which is expressly precluded under Section 905(b). Only one case has been cited in support of this

---

**2.** Plaintiff's counsel has made an elaborate argument that the vessel was negligent in using the aft spring line because it was not in good condition. We find it unnecessary to consider this argument. Assuming that the rope was in good condition, the officers on deck who were in charge of the actual shifting operations should have realized that the stress placed upon it would render it likely to part. The Court rejects West of England's argument that there must have been a latent defect in the line because the other aft spring line did not part. There are too many variables involved in order for one to reach such a conclusion.

argument, *Western Tankers Corporation v. United States,* 387 F.Supp. 487 (S.D.N.Y. 1975). This case is inapposite because it involves a seaman rather than a longshoreman. The Court finds that any liability of ELMA must be based upon a finding of negligence, Section 905(b); *Davison v. Pacific Inland Nav. Co., Inc.,* 569 F.2d 507 (9th Cir. 1978).

Plaintiff has failed to establish any basis for finding ELMA negligent. While the dock was short in relation to the vessel, ELMA's agent in Baton Rouge had made a tugboat available to assist in shifting the M/V PYRAMID VENUS. The testimony of Captain Yap and Captain C. R. Davenport both indicates that the dock was safe under these conditions. ELMA was entitled to expect that shifting maneuvers would be handled safely. More importantly, plaintiff has failed to establish that ELMA's actions were a substantial factor in bringing about plaintiff's injuries. As time charterer, ELMA only leased the cargo-carrying capacity of the vessel. It had no control over the shifting of the vessel. It had no employees present. ELMA's directing the vessel to the Allied dock was not a substantial factor in bringing about plaintiff's injuries. His injuries were caused by the operation of the vessel and plaintiff's own activities. Therefore, the Court finds that ELMA is not liable to plaintiff.

(6) Creole Lines, Pyramid Ventures Group and West of England seek indemnity or contribution from ELMA for alleged breach of the safe berth clause of the charter party. Even if there was a breach of the safe berth clause, we find that this was not a legal cause of plaintiff's injuries and that these third party claims must fail. Compare, *Western Tankers Corporation v. United States, supra* at 490.

Whatever rights ELMA may have had for determination of this claim by arbitration were waived by its proceeding with the lawsuit to this stage without doing more than asserting arbitration as a defense. Pursuant to Rule 14, Fed.R.Civ.P., ELMA could have moved for a severance of the third party claims and for arbitration of that claim, or, alternatively, moved for a stay pending arbitration, *Dempsey & Associates v. S.S. Sea Star,* 1972 A.M.C. 1440 (2d Cir. 1972); 9 U.S.C. § 3.

(7) West of England asks the Court to reconsider its determination that the protection and indemnity insurance policy issued by it to Pyramid Marine and Creole Lines on the M/V PYRAMID VENUS was in force and effect at the time of the accident. West of England reurges its contention that it is able to retroactively cancel the policy for nonpayment of release calls which were assessed on August 24, 1976. West of England contends that it withdrew coverage pursuant to the terms of the policy on October 7, 1976, since the release calls totaling $75,756.23 had not been paid.

This issue was initially decided by Judge E. Gordon West on summary judgment against West of England in a minute entry dated November 14, 1978. Later upon motion by the plaintiff to strike the coverage defense, the Court ordered this defense struck from West of England's answer. (See minute entry dated March 4, 1980.)

Thus, the ruling complained of is now the "law of the case." See *United States v. Horton,* 622 F.2d 144 (5th Cir. 1980). We note that this doctrine is not inflexible and that the earlier rulings may be reconsidered in the interest of judicial economy. However, West of England has not submitted any new law in support of its argument and has failed to convince the Court that its prior rulings are clearly erroneous and work manifest injustice. Therefore, the Court will not reconsider this issue, *Morrow v. Dillard,* 580 F.2d 1284 (5th Cir. 1978).

(8) West of England further contends that it is entitled to a setoff for the unpaid release calls from any judgment rendered against it in favor of plaintiff. Since the Court has not expressly or by implication ruled on this claim, the law of the case doctrine does not apply, *Morrow, supra,* and we will consider it now.

West of England is asking the Court to deduct from plaintiff's award an amount owed by the insureds for release calls under the policy. West of England's authority for this is contained in the Louisiana Direct Action Statute which, *inter alia*, provides:

" . . . Nothing contained in this Section shall be construed to affect the provisions of the policy or contract if the same are not in violation of the laws of this State. It is the intent of this Section that any *action brought hereunder shall be subject to* all of the lawful conditions of the policy or contract and *the defenses which could be urged by the insurer to a direct action brought by the insured,* provided the terms and conditions of such policy or contract are not in violation of the laws of this State.

"It is also the intent of this Section that all liability policies within their terms and limits are executed for the benefit of all injured persons, his or her survivors or heirs, to whom the insured is liable; and that it is the purpose of all liability policies to give protection and coverage to all insureds, whether they are named insured or additional insureds under the omnibus clause, for any legal liability said insured may have as or for a tort-feasor within the terms and limits of said policy." (LSA–R.S. 22:655—Emphasis supplied)

Rule 20(d) of the Rules of the Association, which form the policy of insurance, provides:

"(d) Without prejudice to anything else where contained in these rules the Association shall be entitled to set off any amount due from an insured owner *against any amount due to such insured owner from the Association.* (Emphasis supplied)

Clearly, West of England is entitled to set off the amount owed for release calls against a claim brought by the insureds pursuant to this term of the policy. West of England could have asserted a cross claim for this amount against the insureds, but it has not done so. It might be reasonable to subject plaintiff to such a defense

when the insured is not a party to the action, but where the insureds are in court, we will not allow the insurer to subject the plaintiff to a setoff for an amount owed by the insureds under the policy. See *Holtzclaw v. Falco, Inc.,* 355 So.2d 1279 (La.1978).

### Damages

■ The Court finds that plaintiff is entitled to an award to compensate him for present, past and future pain and suffering and that $35,000 is a just amount. It was stipulated that plaintiff's medical expenses were $3,652.62 and he is entitled to an award of $3,652.62 for past medical expenses. There has been no evidence presented relating to future medical expenses so the Court makes no such award.

Fourteen weeks after the accident, plaintiff returned to work restricted to light duty. Plaintiff continued to work for Allied until January 16, 1978. He missed approximately four weeks of work in 1976 due to his second surgical procedure. Plaintiff claims that he is entitled to recover lost wages for this period of about eighteen weeks. At the time of the accident, plaintiff's pay was $19,500 annually, and when he returned to "light duty" in August, 1975, his pay was $18,300. He is entitled to $5,250 for lost wages in 1975 ($375 × 14 weeks) and to $1,400 ($350 × 4 weeks) for 1976.

■ Plaintiff is entitled to an award for his loss of earnings from January 16, 1978, until the date of trial, May 12, 1980. On January 16, 1978, plaintiff was earning $21,400. The Court finds that he is entitled to an award of $49,220 for loss of past earnings ($21,400 for 2.3 years). Plaintiff argues that he is entitled to estimated pay increases and to "fringe benefits" also. The Court finds no evidence upon which to base such an award, particularly in view of the fact that plaintiff's position was abolished. Had he been healthy, he would no doubt have sought and obtained other employment, but there is no evidence to support the conclusion that he would have been able to continue earning at the same rate.

Accordingly, neither fringe benefits nor future increases will be considered.

■■■ The Court further finds that plaintiff is entitled to an award for loss of future earnings for his estimated work life expectancy which was established as ten years. While plaintiff has a duty to minimize his damages, the Court finds that plaintiff was physically disabled and too old to compete in the job market after January of 1978. Future earnings will be discounted at 6 percent and plaintiff's economist established that 14 percent is an appropriate income tax bracket for plaintiff over the next ten years. Thus, his gross earnings of $21,400 less 14 percent income tax will be considered as net earnings of $18,400 per year. Therefore, plaintiff is entitled to the following awards:

| | | |
|---|---|---|
| Past wages (to trial date) | $55,870.00 | |
| Past medical expenses | 3,652.62 | |
| | 59,522.62 | |
| Less award to intervenor | 26,143.50 | |
| | | 33,379.12 [3] |
| Past and future pain and suffering | 35,000.00 | |
| Future earnings discounted at 6 percent | 135,430.00 | |
| | | 170,430.00 [4] |
| TOTAL | | $203,809.12 |

Intervenor, Travelers Insurance Company, the compensation insurer of plaintiff's employer, is entitled to $26,143.50 as stipulated at trial, together with prejudgment interest at the legal rate. *Howell v. Marmpegaso Compania Naviera*, 578 F.2d 86 (5th Cir. 1978).

■■■ Mrs. Weiland is entitled to an award of $15,000 for loss of her husband's society, *American Export Lines, Inc. v. Alvez, supra*, together with post-judgment interest. Although no additional evidence was offered on this point, the Court finds that there is evidence which shows that the wife has experienced a reduction in the love, affection, care, attention and companionship of her husband which was caused by his injuries and which will continue.

Counsel for plaintiff shall prepare a judgment in accordance with these findings and submit it to the Court after submission to opposing counsel.

## ON MOTIONS TO AMEND

In this action under the Longshoremen's and Harbor Workers' Compensation Act, 33 U.S.C. § 905(b), plaintiffs and defendant, West of England Shipowners Mutual Indemnity Corporation (Luxembourg), have both filed motions to amend the Court's Findings of Fact and Conclusions of Law under Rule 52(b) dated January 28, 1981.

Plaintiffs naturally complain that the award for present, past and future pain and suffering is too low and defendant complains that it is too high. Plaintiffs also complain that insufficient prejudgment interest was awarded. The Court has reviewed the awards and the arguments submitted and finds no reason to modify the awards or to change prejudgment interest.

The motion of plaintiffs is DENIED.

Defendant's motion raises multiple issues, primarily relating to the Court's findings of fact. Only three issues merit comment.

### (1) *The Claims of Mrs. Weiland*

This case was tried to the Court without a jury and submitted prior to the decision

---

**3.** While prejudgment interest is in the discretion of the trial court, "discretion to deny prejudgment interest is created only when there are 'peculiar circumstances' that would make it inequitable for the losing party to be forced to pay prejudgment interest," *Noritake Co., Inc. v. M/V Hellenic Champion*, 627 F.2d 724 (5th Cir. 1980). The Court, in its discretion, finds no such peculiar circumstances here and finds that plaintiff is entitled to interest at 7 percent from April 15, 1975, until paid on this award. See *Harrison v. Flota Mercante Grancolombiana, S.A.*, 577 F.2d 968 (5th Cir. 1978), affirming an award of 6 percent prejudgment interest although five years had elapsed between injury and trial and fourteen months between trial and judgment. See, also, *McCormack v. Noble Drilling Corp.*, 608 F.2d 169 (5th Cir. 1979), where an award of prejudgment interest to an injured harbor worker was upheld although he was 20 percent negligent.

**4.** This award will carry post-judgment interest at the legal rate, *Fisher v. Agios Nicolaos*, 628 F.2d 308 (5th Cir. 1980), at footnote 3.

of the Supreme Court in *American Export Lines, Inc. v. Alvez,* 446 U.S. 274, 100 S.Ct. 1673, 64 L.Ed.2d 284 (1980), holding that the wife of an injured longshoreman has an independent cause of action against the negligent vessel for loss of his society. The matter was reopened and Mrs. Weiland was permitted to intervene to assert her cause of action after the Supreme Court's decision came down, and the parties were granted the opportunity to offer additional evidence on that issue. After consideration, all parties declined to offer additional evidence and they agreed to submit Mrs. Weiland's claim on the record as already made up. West of England complains about the Court's comment on page 17 of the findings and conclusions relating to the award in favor of Mrs. Weiland. The Court there commented, "[a]lthough no additional evidence was offered on this point, the Court finds . . . ." West of England construes the quoted comment as indicating that there was *no evidence* to support Mrs. Weiland's claim, which is simply not correct. Mrs. Weiland testified, as did her husband, regarding these issues, and there is ample evidence to support the award made— which is well within the criteria considered in *Cruz v. Hendy International Co.,* 638 F.2d 719 (5th Cir. 1981). The "additional evidence" comment simply referred to the facts recited above regarding Mrs. Weiland's late entry into this suit.

### (2) *Plaintiff's Infirmities*

West of England also complains of finding of fact number 13 where the Court stated that plaintiff "could not walk, stoop, bend, lift or engage in any strenuous physical activity." Defendant points out that the plaintiff did physically walk to the witness stand and walked around the courtroom. The statement used by the Court is inexact and it was certainly not intended to imply that plaintiff is totally limited in physical motion. That statement is deleted and is hereby amended so as to read as follows:

> "Plaintiff attempted to return to work on 'light duty,' mostly clerical work, since his injuries have left him with limited capacity to walk, stoop, bend, lift or engage in any strenuous physical activity."

### (3) *The Setoff Claim*

West of England also contends that conclusion of law number eight is in error regarding its claim of setoff against the plaintiff in the amount of unpaid "release calls" owed by the insureds, Creole Lines, Ltd., and Pyramid Ventures Group, Inc. After consideration, the Court is convinced that the discussion of this issue on pages 14 and 15 is inadequate. Accordingly, all of conclusion eight on pages 14 and 15 of the Findings of Fact and Conclusions of Law dated January 28, 1981, is hereby withdrawn, and conclusion eight is hereby amended to read as follows:

> "The insurance in this case was issued under association rules providing for an initial payment or 'premium' and subsequent assessments predicated upon actual loss experience. The parties have stipulated that the following facts are correct:

> "The M/V PYRAMID VENUS was originally enrolled in the association on April 10, 1973, and was enrolled for each subsequent year until coverage was terminated by West of England.

> "Creole Lines, Ltd., paid all advance calls for the 1973 policy year, the 1974 policy year, the 1975 policy year and the 1976 policy year, totaling $71,486.92.

> "This accident occurred on April 15, 1975, and suit was instituted on January 7, 1976. In accordance with the rules of the association, retrospective 'release calls' were issued against Creole Lines, Ltd., and assessed on August 24, 1976, in the total amount of $75,756.23, representing calls for the years 1973, 1974, 1975 and 1976.

> "On October 7, 1976, coverage was retroactively withdrawn by reason of failure to pay the 'release calls.'

> "West of England now demands that the unpaid 'release calls' owed by Creole Lines, Ltd., in the amount of $75,756.23 be setoff against the judgment in favor of plaintiffs.

> "West of England has cited no authority for this proposition except the rules of

the association which purportedly granted the right to retroactively withdraw coverage so as to void coverage *ab initio.* West of England also points out that Creole Lines, Ltd., is insolvent although apparently no formal bankruptcy proceedings are pending.

"West of England simply relies upon the provisions of the Louisiana Direct Action Statute, LSA–R.S. 22:655, which grants a right of direct action in favor of an injured party 'within the terms and limits of the policy.'

"Conclusion number seven on pages 13 and 14 discusses the argument made by West of England that it has no coverage since it had retroactively terminated the policy for nonpayment of the 'release calls.' As there pointed out, that issue was presented to the Court and decided against West of England on November 14, 1978. This claim of setoff, while not specifically included in the ruling of the Court at that time, is predicated upon exactly the same argument—it simply represents a slightly different application. In the first claim, West of England argued that there was no coverage at all and at this time it argues that by reason of nonpayment of the same 'release calls' it is entitled to offset the amount of those unpaid premiums against the plaintiff's judgment.

"The right of plaintiffs to institute a direct action against West of England vested at the time of the accident on April 15, 1975, and all delinquencies of the insured occurred subsequent to the date of the accident. This Court will not permit subsequent events to abrogate the right of the plaintiffs to sue on the policy which accrued at the time of the accident. Any stipulation to the contrary would be a violation of Louisiana law and therefore reprobated by LSA–R.S. 22:655. Since the insured is now insolvent, West of England's argument smacks of an attempt to void coverage because of the insolvency of the insured. This is in direct contravention of the Direct Action Statute which forbids any contract of liability insurance 'unless it contains provisions to the effect that the insolvency or bankruptcy of the insured shall not release the insurer from the payment of damages for the injuries sustained or loss occasioned during the existence of the policy.' "

West of England's claim for setoff is DENIED.

For the foregoing reasons, the motion to amend the Findings of Fact and Conclusions of Law filed on behalf of plaintiffs is hereby DENIED; the motion to amend the Findings of Fact and Conclusions of Law filed on behalf of defendant, West of England Shipowners Mutual Indemnity Corporation (Luxembourg), is hereby DENIED.