Phillip W. BATES, Jr., Plaintiff,

v.

MERRITT SEAFOOD, INC. and Full House Enterprises, Defendants.

Fay Marie BATES, Plaintiff,

v.

MERRITT SEAFOOD, INC. and Full House Enterprises, Defendants.

Civ. A. Nos. 2:85–1826–1, 2:86–1646–1.

United States District Court,
D. South Carolina,
Charleston Division.

June 30, 1987.

Lionel S. Lofton and Mark C. Tanenbaum, Charleston, S.C., for plaintiffs.

Michael T. Cole and Bonum S. Wilson, III, Charleston, S.C., for Merritt Seafood.

Antony M. Merck, Charleston, S.C. for Full House Enterprises.

## ORDER AND JUDGMENT

HAWKINS, District Judge.

These are consolidated admiralty actions initiated by Phillip W. Bates, Jr., a marine electronics technician, and Fay Marie Bates, his wife, against Merritt Seafood, Inc. (hereinafter "Merritt Seafood") and Full House Enterprises, Inc. (hereinafter "Full House"), as a result of a fall by Mr. Bates while working onboard the fishing vessel OUTLAW on July 3, 1984. Plaintiff Phillip Bates' action is brought pursuant to Section 5(b) of the Longshore and Harbor Workers' Compensation Act, as amended in 1972 (hereinafter "LHWCA"), 33 U.S.C. § 905(b). Plaintiff Fay Bates' derivative action is brought under the general maritime law as authorized by the United States Supreme Court in *American Export Lines, Inc. v. Alvez*, 446 U.S. 274, 100 S.Ct.

1673, 64 L.Ed.2d 284 (1980). The plaintiffs seek damages for personal injuries and loss of consortium. Defendant Full House has answered, denying liability, alleging contributory negligence on the part of the plaintiff Phillip Bates, and seeking to limit its liability pursuant to the Limitation of Liability Act (hereinafter "LLA" or "the Act"), 46 U.S.C. § 181 *et seq.* Defendant Merritt Seafood has also answered, denying liability, alleging contributory negligence on Mr. Bates' part, and seeking to limit its liability pursuant to the LLA.

The case was tried before the court, sitting without a jury, commencing on the 18th day of February 1987, and concluding on February 23, 1987. The court having considered the testimony, exhibits, and briefs of all parties, makes the following Findings of Fact and Conclusions of Law in accordance with Rule 52(a), Federal Rules of Civil Procedure.

LIABILITY

## FINDINGS OF FACT AS TO LIABILITY

1. Plaintiff Phillip W. Bates, Jr. (hereinafter referred to in this portion of the court's order as "plaintiff" or "Bates") is a highly skilled marine electronics technician and was employed by Maricom Electronics, Inc. (hereinafter "Maricom") on July 3, 1984. He had been so employed as of that date for thirteen years.

2. Maricom is an expert and experienced electronic repair company engaged in the business of repairing electronic equipment aboard marine vessels.

3. On July 2, 1984, after nearly a week of fishing at sea, the F/V OUTLAW docked at Moultrie Fisheries, Inc. (hereinafter "Moultrie Fisheries") on Shem Creek, a navigable stream, in Mount Pleasant, South Carolina. The OUTLAW is a fiberglass hull vessel, documented by the United States Coast Guard as being 47.9 feet in length. The documented owner of the vessel is defendant Full House. Sometime during the morning of July 2, 1984, the OUTLAW off-loaded its catch of swordfish and tuna.

4. The catch on the OUTLAW that day was a small catch, comprised of only eleven fish having a total weight of 461 pounds. Included in this catch were ten swordfish and one tuna.

5. Captain Peter Bradley (hereinafter "Captain Bradley" or "Bradley"), the captain of the OUTLAW, testified that whenever the vessel was docked she was always moored to the port side and her catch was always unloaded across her port rail onto the dock. Directly contrary to this testimony, however, are certain photo exhibits showing the vessel moored to its starboard side at other ports of call where fish were unloaded from the OUTLAW.

6. Hugh "Red" Simmons (hereinafter "Red Simmons" or "Simmons"), the owner of Moultrie Fisheries, testified that the OUTLAW is normally moored port side to and discharged right in front of the fishhouse under the "unloading boom" whenever said vessel unloads its catch at Moultrie Fisheries. However, Red Simmons also testified that since the catch on the OUTLAW on July 2, 1984, was a small catch, he did not want to shuffle the boats docked for unloading at Moultrie Fisheries and, therefore, had the OUTLAW unloaded where it was docked near the Trawler restaurant rather than under his shed.

7. The plaintiff testified that the OUTLAW was docked on July 3, 1984, at the same location where the vessel was unloaded the day before as testified to by Red Simmons, namely upstream of Moultrie Fisheries near the Trawler restaurant. In addition, plaintiff testified that the vessel was moored starboard side to the dock with the bow facing the Shem Creek bridge. Finally, the record is devoid of any evidence to the effect that the OUTLAW was moved from its mooring at the Moultrie Fisheries dock between the time it was unloaded on July 2, 1984, and the time plaintiff slipped and fell on the vessel's deck on July 3, 1984.

8. In light of the above testimony and the referenced exhibits, the court therefore finds that on July 2, 1984, the OUTLAW was docked by Captain Bradley for purposes of unloading upstream of Moultrie

Fisheries near the Trawler restaurant, starboard side to the dock and bow facing the Shem Creek bridge. As a necessary inference therefrom, the court further finds that the OUTLAW off-loaded its catch across the starboard side of the vessel onto the dock at Moultrie Fisheries.

9. Captain Bradley and a crew member, Scott Allen, testified that they were on the boat when the catch of eleven fish was off-loaded on July 2, 1984. The off-loading process involves handing up the fish, which had been gutted on deck at sea at the time they were caught and then packed in ice in the hold, from the hold located near the center of the boat onto the deck of the vessel and then manually unloading them off the side of the vessel onto the dock. The door to the hold is part of the deck located in a passageway that spans the breadth of the vessel.

10. This was the second or third trip on the OUTLAW for its new captain, Bradley, and its new butcher,[1] Scott Allen. Red Simmons testified at his deposition that an inexperienced butcher might leave enough "guts" in the catch when cleaning at sea so as to cause the fish to become "slimey."

11. Captain Bradley testified at trial that, while swordfish may deposit a dark color onto the deck of the boat or clothing of those handling the fish, this is pigmentation from the rough, shark-like skin of the fish and that there is no slime or slippery substance on the outside of the fish. However, while testifying at his deposition, Captain Bradley stated that the fish leave "fish slime," a "slippery" substance, behind on the vessel during unloading operations.

12. Crewmember Scott Allen testified that there is no slime on the outside of a scaleless fish such as a swordfish. He also testified that scaley fish, such as the 90–pound tuna offloaded from the OUTLAW on June 2, 1984, have slime on the outside of their bodies.

13. The court had the opportunity to view a video tape prepared by defendant Merritt Seafood showing the unloading pro-

cess. Based upon this tape and the testimony of the witnesses, the court finds that the unloading process generates a fair amount of slippery foreign substances on the deck of the vessel which the crewmembers walk through and track around the vessel. Although not shown on the video, on cross examination Captain Bradley admitted that he had had the deck of the OUTLAW washed during the video taping of the unloading, and that this was not a common practice. It is obvious to the court that the captain had this done because the deck had become messy and slippery with foreign substances from the fish being unloaded.

14. In addition to normal cleaning operations when the OUTLAW was at sea, the entire boat was cleaned according to Captain Bradley and Scott Allen after the last fish was landed and they headed for port. The same two witnesses also testified that it is normal procedure to clean the stern deck area with fresh water following the unloading of fish. While the crew testified that they did, in fact, clean the stern deck area after unloading on July 2, 1984, they testified that they normally wash the passageway on the starboard side of the vessel only after gutting the fish at sea and did not clean it after they arrived in port on July 2, 1984, after the unloading.

15. After the unloading operation, Captain Bradley telephoned the plaintiff's employer, Maricom, to request repair of the ship's radar. Neither Captain Bradley nor the crew made any preparations for the plaintiff Bates' arrival on board to make the requested repairs.

16. On July 2, 1984, Captain Bradley advised Roy Merritt, Secretary and Treasurer of Full House, by phone that the radar on the OUTLAW was in need of repair. Merritt did not give Bradley any instructions regarding preparing the vessel for the repairman or request that Bradley or any other crewmember, remain on board the vessel during the repair operation. Neither Full House nor Merritt Seafood had instructed the captains or crewmembers of their boats in procedures to follow

---

1. The butcher is responsible for gutting and cleaning the fish at sea.

in cleaning the vessels after fish off-loading or preparing the vessel for repair operations by repairmen such as Bates.

17. On July 2, 1984, it was cloudy throughout the afternoon. It rained in the morning and there was a thunderstorm in the late afternoon. There was a total of .48 inches of rain that day. The low temperature was 74° and the high was 86°. The relative humidity July 2, 1984, ranged from 94% at approximately 4:00 a.m. to 87% at 7:00 p.m.

18. On July 3, 1984, at 7:00 a.m., the temperature was 70°. At 10:00 a.m. it was 78°. The relative humidity was 87% up to 10:00 a.m. that day when it decreased to 72%.

19. On July 3, 1984, plaintiff Bates reported to work at Maricom and was directed to Shem Creek in Mount Pleasant, South Carolina, to work on various fishing vessels, including the repair of the radar on the OUTLAW. Before departing for Shem Creek, Bates gathered together all the tools and equipment from Maricom's office which were necessary to carry out the repair operation.

20. At approximately 9:30 a.m. on July 3, 1984, plaintiff Bates arrived at the OUTLAW accompanied by Rick Berry, another electronics technician employed by Maricom. Berry worked on another vessel, the PROVIDER, docked adjacent to the OUTLAW.

21. When the plaintiff arrived at the OUTLAW, no one was on board the vessel, although the defendants, through their agent Captain Bradley, knew that a radar repairman would be present on the vessel sometime that day to make the requested repairs. The vessel was docked with the starboard side to the dock.

22. The stern deck of the OUTLAW, upon plaintiff's arrival, was littered with poles and flyers and other gear left by the crew. The stern deck was cluttered by the equipment of the vessel, including the poles and flyers.

23. The transmitter for the radar on the OUTLAW was located on the roof of the wheelhouse. The radar controls were located in the wheelhouse. A vertical ladder located on the starboard side of the vessel near the wheelhouse was the only access to the radar transmitter. To reach the ladder from the wheelhouse, three routes were available. The first was around the bow on the port side and back down the bow on the starboard side; this route would have exposed plaintiff to the water without any guardrail. The second was across the stern deck and back up the gunwale of the vessel on the starboard side; this route would require plaintiff to walk across the cluttered deck and back up the outside edge of the vessel without any rail available on a ledge approximately eighteen inches wide. The third route was straight through the passageway from the wheelhouse to the ladder on the starboard side, a distance of approximately ten feet. While there were certain minor obstructions along this route, this was the shortest and most direct route and would keep the plaintiff on approximately the same level as the wheelhouse door, requiring him to go through a space not as narrow as the gunwale, not as cluttered as the stern deck, and not as exposed to the sea as the other two routes. In fact, both Captain Bradley and Scott Allen testified that it was not uncommon for the crew to use this route, and that on occasion they, themselves, had used it.

24. Based on the above, the court finds that the plaintiff took the most direct route from the wheelhouse to the ladder, and from the ladder to the wheelhouse; and that his choice of routes was reasonable under the circumstances.

25. Upon examination of the transceiver, the plaintiff found that the magnatron needed to be replaced. He then left his tools on the top deck and proceeded back to his car to get a replacement magnatron and returned to the roof of the wheelhouse.

26. Plaintiff decided to do the repair work in the air-conditioned wheelhouse to cool off from the morning heat and because he needed to solder the connection. He placed his voltmeter, the transceiver, and the new magnatron at the edge of the roof of the wheelhouse near the top of the lad-

der and climbed down the ladder with the transceiver. When he reached the bottom of the ladder, he placed the transceiver on the deck of the passageway leading to the wheelhouse. He went back up the ladder and retrieved his test meter, which he brought down and placed on the deck near the transceiver. He then went back up the ladder for the magnatron. He came down the ladder holding the magnatron in his left arm and holding the ladder with both hands. When he reached the bottom rung of the ladder with both feet on the bottom rung, he let go of the ladder with his left hand and slid his right hand over to the left vertical rail of the ladder. He then stepped with his left foot around and over the edge of the wheelhouse fairing [2] aft of the ladder and into the passageway. When he did so, his left foot hit a slick spot and, being unable to hold on to the ladder with his right hand, he fell, crashing into the open gear of the long-line reel winch with his back and landing on his left buttock. The plaintiff located the magnatron, realized it had been bent in the fall, and then looked to see what he had slipped on. He reached out with his open hand and felt a slimey, slippery substance that he identified as "fish slime."

The spot where the substance identified as fish slime was located is adjacent to the door to the cooler where the catch is stored and is the area that was not cleaned after the unloading process.

Captain Bradley testified in his deposition that fish leave "fish slime," a "slippery" substance, behind on the vessel during unloading operations. He also testified that the crew did not clean the area where plaintiff fell after the unloading operation on July 2, 1984. In view of the above testimony of Bradley and the plaintiff, as well as paragraphs 7 and 10–13 of the court's Findings of Fact, the court further finds that the plaintiff slipped and fell on fish slime left by the captain and crew on the deck of the vessel.

2. "Fairing" is defined by Webster's Third New International Dictionary of the English Language as a member or structure, the primary

27. The court further finds that the manner in which the plaintiff conducted himself on board the vessel was reasonable and prudent under the circumstances and that his conduct was in no way a contributing cause of his fall and injury.

28. It was the responsibility of the captain of the OUTLAW, Captain Bradley, to maintain the vessel while it was away from its home port. Bradley also hired and paid the crew from his own funds, determined where to fish, and had complete autonomy for the day-to-day operations of the vessel. Bradley was considered a competent, trusted employee to whom the management and maintenance of the vessel was entrusted. He was not paid a salary, but received a share of the profits from each catch.

29. From a preponderance of the evidence, the court finds that the captain and crew, prior to Bates' coming aboard, failed to exercise ordinary care under the circumstances to have the ship in such a condition that Maricom, an experienced marine electronics repair company, with the exercise of reasonable care, could carry out its repair operation with reasonable safety to its employees, and that Captain Bradley and his crew failed to warn Maricom of the hidden danger presented to it and created by the vessel, being the fish slime hidden from view in the passageway. It should have been foreseeable to the captain and crew that Maricom's employee—the plaintiff Bates—might be forced by the needs of the repair work necessary to go atop the wheelhouse to fix the radar, and that he might be expected to use the most direct route to do so, as well as one commonly used by the crew, namely, the passageway the captain and crew failed to clean or inspect after the unloading and before Bates came aboard. The captain and/or crew were negligent, therefore in the following particulars:

(a) In failing to inspect the passageway used by Bates to conduct his repair operation;

function of which is to produce a smooth outline.

(b) In failing to thoroughly wash down the vessel and clean off the fish slime left on the deck of the vessel after the unloading operation;

(c) In failing to clear the deck of obstructions prior to Bates' arrival;

(d) In failing to warn Maricom, when placing the repair call, of the non-obvious and hidden presence of fish slime in the passageway when Bradley knew that one of Maricom's employees would be dispatched to board the vessel and repair its radar.

(e) In failing to remain on board or station another crewmember on board to warn Bates of the non-obvious and hidden presence of fish slime in the passageway when Bradley knew that Bates would be present to repair the vessel's radar.

30. As stated earlier, the documented owner of the vessel OUTLAW is Full House, a Florida corporation. The sole shareholders and officers of the corporation are Allen Merritt, President, and Leroy Merritt, Secretary and Treasurer, who each own fifty percent (50%) of the stock. The only asset owned by the corporation is the OUTLAW, and the only business the corporation engages in is commercial fishing via the OUTLAW. Bradley is Full House's only employee. While Bradley is not a corporate officer, he is, and the court so finds, the manager of the corporation's fishing operation, and his scope of authority as its managing agent was sufficiently broad to bind the corporation.

31. Merritt Seafood is a Florida corporation whose sole shareholders and officers are Allen Merritt, President, Leroy Merritt, Secretary, and Fran Merritt Pinnell, Secretary. Merritt Seafood is a wholesale seafood operation. The OUTLAW sells all of its catch to Merritt Seafood as do other vessels owned by corporations controlled by Leroy and Allen Merritt.

32. Leroy Merritt travelled to Mount Pleasant, South Carolina, in 1981, shortly after Merritt Seafood was incorporated, to meet with Red Simmons of Moultrie Fisheries and make arrangements for Simmons to serve as Merritt Seafood's local agent.

Since 1981, Moultrie Fisheries has allowed Merritt boats, including the OUTLAW, to dock there and unload fish. Simmons serves as Merritt Seafood's docking agent. Simmons maintains an open account for Merritt Seafood, which includes allowing the crew to charge supplies, provisions and repair bills from other business establishments to an account at Simmons' business. Simmons bills Merritt Seafood for these charges and in turn pays these accounts. He receives payment by checks drawn on Merritt Seafood's account. Prior to July 2, 1984, Simmons advised others, including Tony Smircic, Vice President of Maricom and Bates' immediate superior, that the OUTLAW was owned by Merritt Seafood.

33. The invoice for the repair of the radar performed by plaintiff on July 3, 1984, was submitted by Simmons to Merritt Seafood and was paid by a check drawn on the account of Merritt Seafood.

34. Gale Gerenser, the bookkeeper employed and paid by Merritt Seafood, maintained records of expenses incurred and income earned for the OUTLAW when it docked at Simmons' establishment in Mount Pleasant. Gerenser never advised Simmons or Moultrie Fisheries, Maricom, or the plaintiff that the vessel OUTLAW was owned by an entity other than Merritt Seafood. When making similar arrangements for vessels fishing for Merritt Seafood, but not owned by Merritt Seafood or a corporation controlled by Merritt family members, she did inform Simmons that those vessels were "independent" vessels and made different financial arrangements.

35. The plaintiff testified that Larry Horne, a previous captain of the OUTLAW, told him that Merritt Seafood owned the vessel. Plaintiff also testified that he read a June 1982 article in *Fish Boat* magazine, a commercial fishing trade magazine, about the OUTLAW. That article, admitted into evidence, identifies the OUTLAW as a Merritt Seafood boat. Plaintiff also testified that he was aware of Merritt Seafood's reputation in the industry as a well-run, reputable company that owned safe, top-quality vessels. Plaintiff further testified that he had worked on other Merritt ves-

sels, as well as the OUTLAW, before, and that they were normally clean, safe boats on which to work.

36. Tony Smircic (hereinafter "Smircic" or "Tony Smircic"), who, as stated earlier, is plaintiff's immediate supervisor and the Vice President of the plaintiff's employer, believed that Merritt Seafood owned the OUTLAW. Smircic testified that Red Simmons told him that Merritt Seafood owned the OUTLAW. Smircic also testified that in June 1982 he read the article in *Fish Boat* magazine about the OUTLAW.

37. Smircic testified that on a couple of occasions, when Maricom presented a bill to Simmons for repair work, Simmons told Maricom that he had to wait for Merritt Seafood to send the money from Florida before Maricom would be paid.

38. Leroy Merritt, at his deposition, was unaware of what corporate position he held in the two corporations. He testified that he had not told Red Simmons the OUT-LAW was owned by a separate corporation. Fran Pinnell, the Treasurer of Merritt Seafood and one of its three stockholders, testified at her deposition that Merritt Seafood owned the OUTLAW. At trial, she testified that her deposition testimony was incorrect inasmuch as she had since become aware of the fact that Fullhouse Enterprises owns the OUTLAW.

39. At trial, Leroy Merritt (hereinafter "Merritt" or "Leroy Merritt") testified that before the date of plaintiff's accident and the commencement of this litigation he would not have corrected anyone who, in conversation with him, had referred to the OUTLAW as a Merritt Seafood boat, because the fact that Merritt Seafood was not the true owner of the vessel did not in his opinion "mean anything to the people [he] might have been talking with." In a similar vein, Merritt testified that he had never advised Red Simmons that the OUTLAW was not owned by Merritt Seafood. In addition, Merritt further testified that he was aware of the article in *Fish Boat* magazine identifying the OUTLAW as a Merritt Seafood boat, but that he did nothing to advise anyone that Full House actually owned the vessel. In fact, it was Merritt's

testimony that Merritt Seafood did nothing to alter its manner of doing business with third parties after the publication of the magazine article. According to Merritt, he and the rest of the Merritts associated with the two corporate defendants were not concerned with whether the public was aware of the fact that the OUTLAW was separately and independently owned by Full House because they "were not concerned with what the world thought."

40. At trial, certain documents, consisting of the in-house settlement documents for the OUTLAW and the weigh sheets kept on board the vessel and filled out by Captain Bradley, were entered into the record as exhibits. These documents were all embossed at the top with the caption, "Merritt Seafood, Inc." When asked on cross-examination why it was never indicated on these documents that the vessel was independently owned and operated by a separate corporation, Leroy Merritt testified that in his opinion there "was no need to."

41. Both plaintiff and plaintiff's employer believed that the fishing vessel OUTLAW was owned by Merritt Seafood. Likewise, Red Simmons of Moultrie Fisheries believed that Merritt Seafood was the owner of the vessel.

Admittedly, there is a conflict in the record concerning Red Simmons' knowledge as to the ownership of the vessel. In his first deposition taken on October 21, 1985, Simmons testified that he had always believed that the vessel was owned by "a Merritt" or "Merritt Seafood, Inc." or "The Merritts." This testimony was corroborated over one year later by Simmons in a recorded statement given by him on January 7, 1987. This statement was taken by plaintiff's counsel and contained the following colloquy:

M: Red, um the issue that's important to me in talking to you is who you believed owned the fishing vessel "Outlaw" before this incident happened on July 3, 1984 and at the time it happened. Um, who did you believe owned the fishing vessel "Outlaw" at that time?

R: As far as I know, Merritt Seafood owned it. I billed Merritt Seafood for all expenses and also at the time, Merritt Seafood checks came to pay for all my docking services.

M: Okay, so that before July 3rd, 1984, before Tony Merck and I and, and maybe even Mike Cole started asking you uh, about ownership of the vessels and before anybody made a big to do out of it, then it, its your testimony that you thought that the fishing vessel "Outlaw" was owned by Merritt Seafood, Inc. Is that correct?

R: Right, I had no reason to assume otherwise because everybody on the boats always said they were a Merritt boat.

M: Okay. Um, and you had never heard of the corporation Full House Enterprises before we started this law suit, had you?

R: No.

M: Okay. There was a fishing vessel "The Fullhouse", but, but in terms of Fullhouse Enterprises as being the owner of the "Outlaw" you'd never heard of that, had you?

R: No.

M: Okay. Um, Al Merritt and Roy Merritt testified that they'd both been to South Carolina uh, and met you at various times and they never told you that the "Outlaw" was owned by anything other than Merritt Seafood, did they?

R: No, not to any recollection that I have.

M: Okay. And you deal with and talk to a woman named "Sam" down at Merritt Seafood. I took her deposition and I think her name is Gayle Gerenson. Does that name ring a bell with you?

R: Yeah.

M: She's the woman you deal with all of the time?

R: Right.

M: Um, she testified at her deposition that when she has an independent boat, that is a boat not owned by Merritt, um that she will tell you about that boat, that is that its an independent boat. Is that correct?

R: Right.

M: And she never told you that the "Outlaw" was an independent boat, did she?

R: No.

M: Okay.

R: She told me it was a Merritt boat.

After the statement was transcribed, Simmons reviewed it for accuracy, signed it without making any changes, and returned it to plaintiff's counsel.

Notwithstanding the above, however, on February 5, 1987, during the taking of his second deposition, Simmons testified that he knew as early as March of 1983 that Merritt Seafood did not own the OUTLAW. Specifically, Simmons testified that while visiting Merritt Seafood's business operation in Florida in March of 1983, he was informed by Alan and Roy Merritt that a different corporation owned each of the boats purchased by them.

As the trier of the fact in this case, the court is responsible for weighing the credibility of the witnesses' testimony. In this regard, and based on the entire record before it, the court finds Simmons' earlier testimony concerning the ownership of the vessel to be the most credible for several reasons. First, this testimony was corroborated by Simmons himself in a statement given by him over a year after his initial testimony. In addition, this earlier testimony was corroborated by other witnesses as well. For example, Leroy Merritt testified that he had never told Simmons that the OUTLAW was owned by a separate corporation or that it was not owned by Merritt Seafood. Likewise, Gayle Gerensen testified that she never informed Simmons that the vessel was owned by an entity other than Merritt Seafood or that it was an "independent vessel." Further, Tony Smircic testified that prior to July 2, 1984, Simmons had advised him that Merritt Seafood was the owner of the vessel. For these reasons, the court finds as a fact that Sim-

mons believed that the OUTLAW was owned by Merritt Seafood. Finally, until after this lawsuit was initiated, even the captain and crew believed Merritt Seafood owned the vessel.

Merritt Seafood has the reputation in the seafood business of a solvent, stable business entity that always pays its bills promptly. In this regard, plaintiff testified that his decision to work on a particular boat depended on whether or not he knew he would get paid. Thus, it was his further testimony that he would go on any boat which needed repair so long as he knew he would get paid. In addition, the plaintiff also testified that it made a difference to Maricom as to who owned the boat and whether that owner could be trusted to pay his bills because of Maricom's concern for being compensated for the repair services rendered. Coupled with this testimony was that of plaintiff's supervisor, Tony Smircic, who testified that the first repair order call on the OUTLAW was received from Red Simmons. According to Smircic, he was advised by Simmons at that time that Merritt Seafood was the owner of the OUTLAW and that Simmons would pay for the repair work. Smircic further testified that, after receiving this initial call from Red Simmons, he did not care who called in for repairs on the OUTLAW so long as the same owner owned the vessel.

Based on the above paragraph, as well as Findings of Fact Nos. 32–41, the court finds that the plaintiff and his employer justifiably believed that Merritt Seafood owned the OUTLAW, that they were performing work for Merritt Seafood, and that they relied on Merritt's ownership and reputation when entering into the contract for repairs of the radar on the vessel.

42. While the registered owner of the vessel OUTLAW is Full House, neither plaintiff, his employer, nor Simmons, had ever heard of Full House prior to plaintiff's injury.

43. Neither Merritt Seafood nor any of its officers, shareholders or employees, did anything to advise the persons with whom they dealt that Merritt Seafood did not own the vessel OUTLAW when they knew, or should have known, that those persons believed that they were dealing with Merritt Seafood when dealing with the OUTLAW.

44. Leroy Merritt, Fran Pinnell, and other agents of defendant Merritt Seafood, were aware, or should have been aware, that persons they dealt with believed Merritt Seafood was the owner of the vessel OUTLAW and did nothing to correct this belief. Further, they were aware, or should have been aware, that people believed that they were doing business with Merritt Seafood when doing business with the OUTLAW and did nothing to correct this belief.

45. While there is no common stock ownership between Merritt Seafood and Full House, the two co-defendants do share officers and directors and have common shareholders.

46. Based on Findings of Fact Nos. 30–44, the court finds that Merritt Seafood and Full House did not hold themselves out to their employees or the public as separate entities. The court finds that the OUTLAW and Captain Bradley and his crew were apparent agents of Merritt Seafood because Merritt Seafood placed them in a position such that those persons with whom they dealt believed that they were acting on behalf of Merritt Seafood; that Merritt Seafood is liable for the negligence of its apparent agents, Captain Bradley and the other members of the crew of the OUTLAW.

47. Leroy Merritt testified that in actuality Full House, not Merritt Seafood, manages and controls the vessel OUTLAW and is ultimately responsible for the vessel's maintenance and operation. He also testified that Merritt Seafood has no money invested in the OUTLAW and that there is no contract or agreement between Merritt Seafood and Full House for the operation of the OUTLAW, except that Merritt Seafood purchases seafood from the OUTLAW.

## CONCLUSIONS OF LAW AS TO LIABILITY

1. This court has jurisdiction of these consolidated actions by virtue of the

admiralty and maritime jurisdiction of the District Court of the United States; the injury complained of occurred upon navigable waters and had a maritime nexus. *See Whittington v. Sewer Construction Company, Inc.,* 541 F.2d 427 (4th Cir.1976).

2. Plaintiff Phillip W. Bates, Jr.'s (hereinafter referred to in this portion of the court's order as the "plaintiff" or "Bates") action arises under Section 5(b) of the LHWCA, 33 U.S.C. § 905(b). Section 905(b) authorizes a longshoreman injured in the course of his employment by the negligence of a vessel to bring a third-party action against the shipowner. Plaintiff Fay Marie Bates' action for loss of consortium is authorized by *American Export Lines, Inc. v. Alvez,* 446 U.S. 274, 100 S.Ct. 1673, 64 L.Ed.2d 284 (1980); *see also, Doca v. Marina Mercante Nicaraguense, S.A.,* 634 F.2d 30 (2d Cir.1980).

3. The standard of care applicable to the defendants is governed by the landmark case of *Scindia Steam Navigation Co., Ltd. v. De Los Santos,* 451 U.S. 156, 101 S.Ct. 1614, 68 L.Ed.2d 1 (1981) and its progeny. In *Scindia,* a longshoreman was injured when a winch, which was a part of the ship's gear, malfunctioned. At the time of the accident, a loading operation had been going on for two days and the winch had been malfunctioning throughout this period. Faced with these facts, as well as the legislative history of the LHWCA and its amendments, the Supreme Court enunciated a three-fold standard of care applicable to the vessel owner/longshoreman relationship. First, the vessel owner has a two-fold duty to

> exercis[e] ordinary care under the circumstances to have the ship and its equipment in such condition that an expert and experienced stevedore will be able by the exercise of reasonable care to carry on its cargo operations with reasonable safety to persons and property, and [to warn] the stevedore of any hazards on the ship or with respect to its

equipment that are known to it in the exercise of reasonable care, that would likely be encountered by the stevedore in the course of his cargo operations and that are not known by the stevedore and would not be obvious to or anticipated by him if reasonably competent in the performance of his work.[3] *Id.,* at 416, n. 18, 89 S.Ct., at 417 [sic].[4] The shipowner thus has a duty with respect to the condition of the ship's gear, equipment, tools and work space to be used in the stevedoring operations; and if he fails at least to warn the stevedore of hidden danger which would have been known to him in the exercise of reasonable care, he has breached his duty and is liable if his negligence causes injury to a longshoreman.

*Scindia,* at 167, 101 S.Ct. at 1622. Secondly,

> the vessel may be liable if it actively involves itself in the cargo operations and negligently injures a longshoreman or if it fails to exercise due care to avoid exposing longshoremen to harm from hazards they may encounter in areas, or from equipment, under the active control of the vessel during the stevedoring operation.

*Id.*

Finally, the court held that "the shipowner has no general duty by way of supervision or inspection to exercise reasonable care to discover dangerous conditions that develop within the confines of the cargo operations that are assigned to the stevedore," *id.* at 172, 101 S.Ct. at 1624; but if the shipowner has actual knowledge that an apparently dangerous condition exists or has developed in the cargo operation, and a reasonable belief that the stevedore will not or cannot remedy that danger, and that the longshoremen cannot avoid it, the shipowner has a duty "to take steps, reasonable in the circumstances, to eliminate or neutralize the hazard." *Id.* at 175, 101 S.Ct. at 1626.

---

**3.** For purposes of convenience, this two-fold duty to provide a safe work place and to warn of hidden dangers will hereinafter be referred to as the first *Scindia* duty.

**4.** *Federal Marine Terminals, Inc. v. Burnside Shipping Co.,* 394 U.S. 404, 89 S.Ct. 1144, 22 L.Ed.2d 371 (1969).

4. Although *Scindia* only addressed the vessel owner's duty to a longshoreman, subsequent decisions have held that its principles generally apply to all independent contractors and their employees. *See Hill v. Texaco, Inc.,* 674 F.2d 447 (5th Cir.1982).

5. "In the context of repair operations, however, a vessel owner's duty ... is subtly altered." *Stass v. American Commercial Lines, Inc.,* 1984 AMC 2808, 2812, 720 F.2d 879, 882, (5th Cir.1983). In a pre-*Scindia* decision, the Supreme Court had held that a shipowner "was under no duty to protect [a ship repairman] from the risks that were inherent in the carrying out of the contract." *West v. United States,* 361 U.S. 118, 123, 80 S.Ct. 189, 193, 4 L.Ed.2d 161 (1959). More recent decisions have confirmed that the basic principle underlying the Supreme Court's decision in *West* has continued vitality. *See, e.g., Hill,* 674 F.2d 447; *Stass,* 1984 AMC 2808, 720 F.2d 879; *Duplantis v. Zigler Shipyards, Inc.,* 692 F.2d 372 (5th Cir.1982).[5] Accordingly, a vessel owner has no duty to eliminate hazards inherent in the repair of the vessel or to warn the independent contractor conducting the repairs of their existence.

6. Applying the above standard to the present case, there is no question that Full House, as the documented shipowner, and Merritt Seafood, as the apparent shipowner,[6] did not breach the third *Scindia* duty. No member of the ship's crew or other representative of the shipowners was present on board the vessel at the time of plaintiff Bates' arrival or anytime during the repair operation. Obviously, therefore, the shipowners could not have acquired actual knowledge of a dangerous condition arising during such operations.

7. Likewise, the evidence produced at trial did not establish a breach of the shipowners' second *Scindia* duty. Since no representatives of the vessel were on board during the repair operations, it is clear that no portion of the vessel was under the active control of the shipowners. Furthermore, the shipowners did not retain active control over the repair operations. Case law establishes that such control must have been over the actual methods of work used by the independent contractor and the operative detail. *Cowsert v. Crowley Maritime Corp.,* 680 P.2d 46, 101 Wash.2d 402 (1984). There is no evidence that the owners of the OUTLAW attempted to exercise control over the details of the repair of the vessel's radar. Since such control is the *sine qua non* of the second *Scindia* duty, no such obligation was owed to the ship repairman in the case at bar.

8. The question of whether the first *Scindia* duty was breached, however, does not lend itself to simple resolution. The language in which the court couched this duty raises several questions which must be addressed. They are:

1. Did the dangerous condition arise before or after the commencement of the repair operation?

2. Was the dangerous condition such that an expert and experienced independent contractor would not be able by the exercise of reasonable care to carry on its repair operations with reasonable safety?

3. Did the dangerous condition exist in the work space to be used in the repair operation?

4. Did the condition constitute a hidden danger within the actual or constructive knowledge of the vessel?

5. Was the hidden danger one that would likely be encountered by the independent contractor in the course of its repair operation?

6. Was the hidden danger known to the independent contractor or would it be obvious to or anticipated by it if it was reasonably competent in the performance of its work?

---

5. Although all of these cases involve shipyard situations, it is this court's opinion that the general principle for which they stand is applicable to any and all types of maritime repair operations.

6. For purposes of this court's discussion concerning the applicability of the *Scindia* standard of care, the term "shipowners" shall be used to refer collectively to both defendants.

7. Was the dangerous condition a risk that was inherent in the carrying out of the repair contract?

The first three questions are directed to the issue of whether or not the defendants breached their duty to Bates to provide a safe work space at the outset in such a condition that Maricom would be able to carry on its repair operations with reasonable safety. The remaining four questions concern whether or not the defendants breached their duty to Bates to warn Maricom of hidden dangers at the outset.

9. In the present case, the plaintiffs relied on circumstantial evidence to resolve these issues in their favor and to establish a breach of the first *Scindia* duty by the defendants. This court concludes that their reliance on such evidence to prove the defendants' negligence is sufficient. In *Wratchford v. S.J. Groves & Sons, Company*, 405 F.2d 1061 (4th Cir.1969), the plaintiff was found at the bottom of a highway drain hole and suffered such extensive brain damage that he was unable to recall the circumstances of his fall. Judge Haynsworth rejected the defendant's claim that the plaintiff had failed to offer sufficient evidence of how the accident occurred and that the defendant was entitled to a non-suit if two equally strong conflicting inferences could be drawn from the circumstantial evidence introduced. In *Wratchford*, the court held:

> The old notion that a jury should not be allowed to draw any inference from circumstantial evidence, if the one is as probable as the other, has fallen into discard and has been replaced by the more sensible rule that it is the province of the jury to resolve conflicting inferences from circumstantial evidence. Permissible inferences must still be within the range of reasonable probability, however, and it is the duty of the court to withdraw the case from the jury when the necessary inference is so tenuous that it rests merely upon speculation and conjecture.

*Id.* at 1066.

In *Hodges v. Evisea Maritime Co., S.A.*, 801 F.2d 678 (4th Cir.1986), the Fourth Circuit rejected the defendant shipowner's argument in an LHWCA case that because no evidence directly substantiated the plaintiff's theory of his accident, the jury's verdict in the plaintiff's favor was based upon impermissible speculation. The court stated:

> Although the evidence arguably supported other theories as well, there was evidence that justified Hodges' account of the injury.... Upon this evidence, the jury could find Evisea liable by inferences within the range of reasonable probability, and the district court properly refused either to grant a directed verdict or judgment n.o.v.

*Id.* at 684.

10. By a preponderance of the evidence, the court finds, first, that the dangerous condition, i.e., fish slime left by the captain and crew on the deck of the vessel, arose prior to the commencement of the repair operation. At the time the plaintiff Bates boarded the OUTLAW to repair the radar, the vessel's catch had already been unloaded and its deck had been cleaned for the last time. Furthermore, neither the captain nor any crewmembers were on board the vessel at the time of Bates' arrival or anytime during the repair operation. Upon these facts, the court can only draw the following two inferences: First, that the fish slime on which Bates slipped was generated during the unloading of the OUTLAW at Moultrie Fisheries on the morning of July 2, 1984, and, second, that the captain and crew failed to remove this fish slime when they scrubbed the boat for the final time after the fish were unloaded. Since both the unloading operation and the cleaning operation were carried out prior to Bates' arrival on board the vessel, it is clear that the dangerous condition arose prior to the commencement of the repair operation. Thus, the first question has been answered in favor of the plaintiffs.

11. Turning next to the second question to be addressed, the court must decide whether this dangerous condition was such that an expert and experienced independent contractor would not be able by the exercise of reasonable care to carry on its re-

pair operation with reasonable safety. In resolving this issue, however, it must be kept in mind that, since the shipowner is entitled to rely on the independent contractor to perform its work with reasonable care, the shipowner will be absolved from any liability for injuries caused by a "limited and accepted hazard." *See Hill,* 674 F.2d 447; *Stass v. American Commercial Lines, Inc.,* 1984 AMC 2808, 720 F.2d 879.

With regard to this issue, the court has already made the following findings of fact:

(1) Maricom is an expert and experienced marine electronic repair company. *See* Finding of Fact # 2;

(2) Bates is a highly skilled electronics technician who was employed by Maricom and assigned to repair the radar on board the OUTLAW. *See* Finding of Fact # 1;

(3) Maricom provided Bates with the necessary tools and equipment to carry out the repair operation. *See* Finding of Fact # 19;

(4) The route chosen by Bates to gain access to the radar and carry out his repair operation was reasonable under the circumstances. *See* Finding of Fact # 23 and # 24;

(5) This choice of routes by Bates should have been foreseeable to Captain Bradley. *See* Finding of Fact # 29;

(6) Despite (4) and (5) above, the captain and crew failed to clean or inspect this route after the unloading and before Bates came aboard. *See* Finding of Fact # 29. Because of this failure, fish slime was left in the passageway used by Bates during the course of the repair operation. *See* Finding of Fact # 26.

(7) Notwithstanding the fact that the manner in which Bates conducted himself on board the vessel during the entire repair operation was reasonable and prudent under the circumstances, Bates was unable to complete his repairs without slipping and falling on the fish slime left on the deck of the vessel by the captain and crew. *See* Findings of Fact # 26 and # 27.

In light of these findings, the court concludes, first, that the fish slime left on the deck of the OUTLAW was not a "limited and accepted hazard." While having its genesis in *Scindia,* the concept of a "limited and accepted hazard" was not clearly articulated until the Fifth Circuit applied the doctrine to relieve a shipowner of liability in the case of *Hill v. Texaco, Inc.,* 674 F.2d 447. In *Hill,* Texaco had hired an independent engineering concern to inspect the walls of storage tanks on one of its vessels in order to determine if the amount of rust thereon warranted extensive repairs. Immediately prior to turning the vessel over to the engineer, Texaco had purged the tanks of ballast water, causing the tank walls to be damp and slippery at the commencement of the engineer's operation. When an employee of the engineering firm, Evans Engineering, Inc., was examining the tank wall, he slipped and fell. The court found that:

The tank, although wet, posed only a limited and accepted hazard to Hill until he elected to climb the rusted stiffeners without a safety line. Evans, as an expert in its field, could have brought safety lines with it or borrowed them from the ship. Had Evans done so, Hill could have completed the test with a reasonable degree of safety. *Scindia* teaches that the ship is entitled to assume that the independent contractor aboard the ship will act reasonably with a view toward the safety of its employees. Were this not so, the LHWCA's imposition of a negligence standard rather than a seaworthiness standard on the vessel's conduct towards the harbor-workers would mean nothing.

*Hill,* 674 F.2d at 452 (citations omitted).

A similar holding was reached once again by the Fifth Circuit one year later in *Stass v. American Commercial Lines, Inc.,* 1984 AMC 2808, 720 F.2d 879 (5th Cir.1983). In that case, the defendant, ACL, delivered one of its grain barges to a ship repairer, Louisiana Dock Company, for repairs to the hull and grain doors. When the barge was delivered, sprouted soy beans were scattered over the barge top. During the repair operation, one of Louisiana Dock's

employees, Stass, slipped on the soy beans and injured himself. As in *Hill*, the court found that the slippery conditions

"posed only a limited and accepted hazard," to Stass until he decided to—or, more likely, was ordered to—open grain doors on both sides [of the barge]. As his then-foreman testified, Louisiana Dock policy was always to open doors on only one side of a barge, close them after any inspection ..., and then open the doors on the other side of the barge. Had Louisiana Dock required its own policy to be followed, Stass would not have been injured.

*Stass*, 1984 AMC at 2815, 720 F.2d at 884 (citations omitted).

A comparison of the facts in *Hill* and *Stass* with those in the instant action, however, leads to the conclusion that the present defendants cannot avail themselves of this exception. Unlike their counterparts in *Hill* and *Stass*, Maricom and, more specifically, Bates were properly equipped and carried out their repair operation in a reasonable and prudent manner. Nonetheless, Bates was still unable to complete his repair with a reasonable degree of safety inasmuch as he slipped on the fish slime left on deck, causing him to fall and strike his back and left buttock on the longline reel of the vessel. For these reasons, it is clear that *Hill* and *Stass* do not apply here.

Likewise, for the very same reasons that *Hill* and *Stass* are inapplicable, this court further concludes that the dangerous condition on board the OUTLAW was such that Maricom, as an expert and experienced marine electronics repair company, was not able to carry on its repair operations with reasonable safety.

12. Considering the third question of whether or not the dangerous condition existed in the independent contractor's "work space," the Seventh Circuit has stated, "a shipowner's duty to provide longshoremen with a reasonably safe place to work is confined to those areas of the vessel where longshoremen may reasonably be expected to go." *United States Fidelity & Guaranty Company v. Jadranska Slobodna Plovidba*, 683 F.2d

1022, 1026 (7th Cir.1982). In the case at bar, it has already been determined that Bates' decision to use the passageway route was reasonable and that Captain Bradley and his crew should have anticipated the use of this route by Bates to carry out his repairs. Accordingly, the shipowner owed Bates a duty to eliminate any slippery conditions which might exist in this area.

■ 13. Based on the above discussion, therefore, the court finds the defendants to have been negligent through the acts of their respective agents and apparent agents in the following particulars:

(1) In failing to inspect the passageway used by Bates to conduct his repair operation;

(2) In failing to thoroughly wash down the vessel and clean off the fish slime left on the deck of the vessel after the unloading operation, and

(3) In failing to clear the deck of obstructions prior to Bates' arrival.

The court further finds that by committing said negligent acts, the defendants breached their duty to Bates to provide a safe work space at the outset in such a condition that Maricom, with the exercise of reasonable care, would be able to carry on its operations with reasonable safety.

14. Looking to the remaining four questions to be addressed, the court is also convinced that the defendants breached their duty to warn of hidden dangers for the reasons expressed below.

15. The fourth question involves knowledge by the shipowner of the danger. A shipowner has a duty to warn an independent contractor of the existence of hidden dangers which are either within his actual or constructive knowledge. *See Scindia*, 451 U.S. 156, 101 S.Ct. 1614. Although there is no evidence that the master or crew of the OUTLAW were actually aware that this area of deck was slippery, there are sufficient facts to support a finding of constructive knowledge. As evidenced below, there was ample reason for the crew to suspect that there might be fish slime in the area in question.

The portion of the deck where this fish slime was located is on the starboard side of the vessel immediately adjacent to the cooler where the catch was stored. During the unloading operation on July 2, 1984, the fish were handed up and passed across the starboard side of the boat onto the dock. Despite the fact that the fish were loaded across the same side and in close proximity to the area where Bates slipped, the crew failed to clean the area before Bates' arrival. Indeed, Captain Bradley testified that the area where Bates slipped is the one area of the deck which the crew never cleans following the unloading of fish. Because of the close proximity shared between the passageway and the unloading area in this particular instance, however, the court is of the opinion that the duty of reasonable care required the crew to clean this portion of the deck, notwithstanding the normal routine cleaning procedure employed by the vessel. If this area had been inspected and cleaned, the fish slime would have undoubtedly been discovered and removed. Accordingly, the court finds that the fish slime constituted a hidden danger within the constructive knowledge of the vessel.

16. Addressing the fifth question raised by the language in *Scindia,* the court must concern itself with whether the fish slime was likely to be encountered by Maricom in the course of its repair operation. Inasmuch as it has previously been determined that the fish slime was located in Bates' work space, this fifth question must be answered in the affirmative without further discussion.

17. The next to the last question relates to the knowledge of the independent contractor. Bates bears the burden of proving that Maricom did not know of the dangerous condition and that such a condition should not have been obvious to or anticipated by any expert or experienced marine electronic repair company so employed to repair the radar on the OUTLAW. Once again, reference to the *Stass* case will prove helpful in determining this issue. As stated earlier, the plaintiff repairman in that case was injured when he slipped on soy beans left scattered on the deck of a grain barge. Even so, the Fifth Circuit held that the defendant in that case had no duty to warn the plaintiff's shipyard employer about the sprouts. This holding was based on a two-fold factual finding. First, it was found that in boarding the barge the plaintiff actually "noticed sprouted soybean or other grain scattered ... around the barge top and covers." *Stass,* 1984 AMC at 2815, 720 F.2d at 881. Secondly and more importantly, it was pointed out that the plaintiff himself testified at trial that fifty (50%) percent of the barges he had previously worked on were littered with grain. *See, id.* Accordingly, it was held by the court that "at least some grain residue on a barge specifically designed to carry grain could be expected by any expert and experienced shipyard." *Id.*

The present facts, however, are distinguishable from those in the *Stass* case. In this suit, neither Maricom nor Maricom's employee, the plaintiff, were actually aware of the existence of fish slime on the deck of the vessel. Likewise, neither one of them had constructive knowledge of this dangerous condition either. Tony Smircic, Maricom's Vice-President, testified that Merritt vessels always had the reputation of being clean, safe vessels. The plaintiff, himself, testified that as a general matter he expected on occasion to encounter fish slime on the fishing boats on which he worked. He then, however, qualified his testimony in the following manner. First, he testified that, although he had worked on numerous shrimp boats and expected to see "particles of fish" on board those type vessels, his experience on swordfish boats was limited and, even then, the few he had been on were normally clean boats. Secondly, Bates testified that, in any event, he did not expect to find fish slime in the vicinity of the vessel where he slipped. Rather, he testified that if he expected to find any fish slime at all, he expected to find it on the back decks of the vessel where the fish were landed and cleaned. It was his further testimony that he consequently made it a practice not to walk on the back decks of the boats, and instead would choose to "go a way that [he didn't]

think there [was] going to be any fish stuff...." In view of this testimony, the court finds that the existence of fish slime in the forward passageway located on board the OUTLAW was not a condition which should have been obvious to or anticipated by any expert and experienced marine electronic repair company.

18. The last question this court must address with respect to the *Scindia* duty of care asks whether the slippery footing caused by the fish slime was a risk inherent in the carrying out of the contract for repairs. Even before *Scindia* it was well recognized that the vessel owner had no duty to deliver his ship to the contractor in a hazard-free condition, when the requested repair would remedy the hazards which cause the injury. *See, e.g., West* 361 U.S. 118, 80 S.Ct. 189. In *West,* the vessel owner

> had no duty to tighten the plugs in the ship's water system, one of which shot off when the water was turned on and injured the plaintiff-employee:
>
>> "It appears manifestly unfair to apply the requirements of a safe place to work to the shipowner when he has no control over the ship or the repairs, and the work of repair in effect creates the danger which makes the place unsafe. The [shipowner], having hired [the shipyard] to perform the overhaul and reconditioning of the vessel—including the testing—was under no duty to protect petitioner from risks that were inherent in the carrying out of the contract." 361 U.S. at 123, 1960 AMC at 19.

See also *Hess v. Upper Mississippi Towing Corp.,* 1978 AMC 331, 335, 559 F.2d 1030, 1036 (5th Cir.1977) (no duty of vessel owner to "free" its barge of gasoline vapors when the "precise reason for plaintiff's employment was to make [that] unsafe condition safe"), cert. denied 435 U.S. 924, 1978 AMC 1896 (1978).

After *Scindia,* the courts have continued to recognize these principles in a repair situation. In *Duplantis,* 1983 AMC 2319, 692 F.2d 372, the Fifth Circuit refused to impose

a duty on the shipowner to free its barge of gas from a cargo of highly-explosive light crude oil prior to delivering the barge to a shipyard to have a leak in the hull repaired. Since gas-freeing the barge was "a necessary first step in doing the work Zigler had undertaken," and "critical to its ability to repair the pinhole," it was "one of the 'dangers which the contractor was hired to correct,'" Id. 1983 AMC at 2322, 692 F.2d at 374–75, quoting *Hess,* supra, 1978 AMC 335, 559 F.2d at 1033, and the vessel owner had satisfied its duties under [*Scindia*] in turning over the vessel. *See also, Hill,* 1984 AMC 1558, 674 F.2d 447 (no duty of vessel owner to remove loose rust caked on walls of vessel's gasoline storage tank when contractor for whom the plaintiff worked was hired to determine the effect of rust on the thickness of the tank walls).

As the above cases illustrate, this "inherent risk" doctrine remains a viable exception to vessel owner liability. Unfortunately for the present defendants, however, this exception has no application here. The parties responsible for cleaning the OUTLAW were the captain and crew. Thus, cleaning the passageway where the plaintiff slipped was not a necessary first step in doing the work Maricom had undertaken. Furthermore, Maricom was not hired to inspect or repair the passageway, but, instead, was hired to repair the radar located on the top of the vessel. In short, therefore, the present case does not involve a situation where a "condition of the ship that requires repair or inspection injures the person hired to inspect or repair that condition." *Hill,* 674 F.2d at 452 n. 5. For these reasons, this court finds that the slippery footing caused by the fish slime did not constitute a risk "inherent in the carrying out of the contract" for repairs. *West,* 361 U.S. at 123, 80 S.Ct. at 193; *Hill,* 674 F.2d at 452.

■ 19. After examining all of the issues raised above, the court concludes that the defendants did, in fact, violate both prongs of their first *Scindia* duty. In summary, it is clear from a preponderance

of the evidence that the defendants failed to exercise ordinary care under the circumstances to have the OUTLAW in such a condition that Maricom, an expert and experienced marine electronics repair company, would be able by the exercise of reasonable care to carry on its repair operations with reasonable safety to its employees, and that the defendants failed to warn Maricom of the hazards presented to it and created by the vessel, being the fish slime hidden from view in the passageway. It should have been foreseeable to the defendants' agents and apparent agents, Captain Bradley and his crew, that Bates might be forced by the needs of the repair work necessary to go atop the wheelhouse to fix the radar and that he might be expected to use the route he did, namely, the passageway Captain Bradley and the crew failed to clean or inspect after the unloading and before Bates came aboard. The defendants, acting through their agents and apparent agents, were therefore negligent in the following particulars:

(a) In failing to inspect the passageway used by the plaintiff to conduct his repair operation;

(b) In failing to thoroughly wash down the vessel and clean off the fish slime left on the deck of the vessel after the unloading operation;

(c) In failing to clear the deck of obstructions prior to the plaintiff's arrival;

(d) In failing to warn Maricom when placing the repair call of the non-obvious and hidden presence of fish slime in the passageway when they had knowledge through their agent and apparent agent, Bradley, that one of Maricom's employees would be dispatched to board the vessel and repair its radar.

(e) In failing to have their agent and apparent agent, Bradley, remain on board or station another crew member on board to warn the plaintiff of the non-obvious and hidden danger when they knew that the plaintiff would be present to repair the vessel's radar.

Accordingly, the court concludes for the reasons stated above, that the plaintiff's injury was caused by the negligence of the OUTLAW and that the defendants breached the standard of care which they owed to the plaintiff under Section 905(b) of the LHWCA.

20. The defendant Full House is not entitled to limit its liability pursuant to the LLA, 46 U.S.C. § 183. Section 183 provides in pertinent part:

(a) The liability of the owner of any vessel, whether American or foreign, for any embezzlement, loss, or destruction by any person of any property, goods, or merchandise shipped or put on board of such vessel, or for any loss, damage, or injury by collision, or for any act, matter, or thing, loss, damage, or forfeiture, done, occasioned, or incurred, without the privity or knowledge of such owner or owners, shall not, except in the cases provided for in subsection (b) of this section, exceed the amount or value of the interest of such owner in such vessel, and her freight then pending.

\* \* \* \* \* \*

(e) In respect of loss of life or bodily injury the privity or knowledge of the master of a seagoing vessel or of the superintendent or managing agent of the owner thereof, at or prior to the commencement of each voyage, shall be deemed conclusively the privity or knowledge of the owner of such vessel.

Under these provisions, the burden is on the shipowner to prove his lack of privity or knowledge of the negligent acts or conditions leading to the plaintiff's injuries. *Rowe v. Brooks*, 329 F.2d 35 (4th Cir.1964); *In the Matter of The Complaint of Hellenic Lines, Ltd.*, 813 F.2d 634, 638 (4th Cir. 1987). If the shipowner knew or should have known that the condition causing the injury existed then he may not limit his liability. *Id.; Puamier v. Barge BT 1793*, 395 F.Supp. 1019 (E.D.Va.1974).

■ In the present case, Full House had privity and knowledge of the injury-causing event through Captain Bradley,[7] who was

---

**7.** As has already been found by this court, Captain Bradley had constructive knowledge of the

slippery condition of the deck.

not only the master of the OUTLAW, but who was also the managing agent of Full House. Bradley not only operated and maintained the vessel, but he also had supervision over the phase of the business out of which the injury occurred and was sufficiently placed in the managerial hierarchy to bind the corporation. *See The Linseed King,* 285 U.S. 502, 52 S.Ct. 450, 76 L.Ed. 903 (1932); *Coryell v. Phipps,* 317 U.S. 406, 63 S.Ct. 291, 87 L.Ed. 363 (1943). In *Continental Oil Company v. Bonanza Corporation,* 706 F.2d 1365 (5th Cir.1983), the Fifth Circuit held that the captain of a vessel owned by the defendant corporation was the managing agent of the corporation because he was responsible for maintaining the ship and hiring its crew subject to the approval of his superiors. He was paid a portion of the profits rather than a salary and received only minimal supervision. The court concluded:

> Because a corporation operates through individuals, the privity and knowledge of individuals at a certain level of responsibility must be deemed the privity and knowledge of the organization, "else it could always limit its liability." *Coryell v. Phipps* (The Seminole), 317 U.S. 406, 410–11, 63 S.Ct. 291, 293, 87 L.Ed.2d 363, 367 (1943). Where the level of responsibility begins must be discerned from the circumstances of each case.
>
> Freeman was more than master, and he had greater responsibility than operation and maintenance of the vessel. Although Freeman was neither a shareholder nor an officer of the close corporation, Fuller granted him so much autonomy in the management of the vessel that the district court was not in error in attributing Freeman's privity and knowledge to the corporation.

*Id.* at 1376–77.

*See also, United States v. Standard Oil Company of California,* 495 F.2d 911 (9th Cir.1974).

■ 21. The defendant Merritt Seafood is liable to the plaintiff under the doctrine of apparent authority. *See* Findings of Fact # s 30–46. Federal courts may turn to the substantive law of the state where the injury occurred when there is no federal maritime precedent as long as the state law does not defeat the maritime cause of action. *Byrd v. Byrd,* 657 F.2d 615 (4th Cir.1981). The Supreme Court of South Carolina, in *Fernander v. Thigpen,* 278 S.C. 140, 293 S.E.2d 424 (1982), applied the doctrine of apparent authority in the context of a personal injury case. The court stated:

> Generally agency may be implied or inferred and may be circumstantially proved by the conduct of the purported agent exhibiting a pretense of authority with the knowledge of the alleged principal. *Fochtman v. Clanton's Auto Auction Sales,* 233 S.C. 581, 106 S.E.2d 272 (1958).
>
> The doctrine of apparent authority provides that the principal is bound by the acts of its agent when it has placed the agent in such a position that persons of ordinary prudence, reasonably knowledgeable with business usages and customs, are led to believe the agent has certain authority and they in turn deal with the agent based on that assumption.

*Id.* 293 S.E.2d at 426. In *Watkins v. Mobil Oil Company,* 291 S.C. 62, 352 S.E.2d 284 (1986), the South Carolina Court of Appeals reiterated the elements necessary to a finding of apparent authority. The plaintiff must show that the purported principal by either affirmative conduct or conscious and voluntary inaction has represented another to be his agent, reliance upon that conduct or inaction, and a change of position in reliance. Those elements are present in the case at hand, and this court finds that Merritt Seafood allowed the OUTLAW and its captain and crew to become apparent agents of Merritt Seafood through its affirmative conduct and its voluntary inaction after being apprised that others dealt with the OUTLAW under the belief that it was owned by Merritt Seafood. The plaintiff and his employer relied upon this representation in doing business with the OUTLAW, and the plaintiff's injury arose from this reliance.

22. The defendant Merritt Seafood is not entitled to limit its liability pursuant to

the LLA, 46 U.S.C. § 183, for the very same reasons that Full House is not entitled to such a limitation. In short, Merritt Seafood, as the apparent owner of the OUTLAW, had privity and knowledge of the injury-causing event through Captain Bradley, who was not only the apparent master of the OUTLAW for Merritt Seafood, but who was also the apparent managing agent of the corporation as well. *See* Finding of Fact # 46; Conclusion of Law # 20. Under the circumstances of this case, therefore, the knowledge of Captain Bradley was sufficient to bind Merritt Seafood. *See Continental Oil Company*, 706 F.2d 1365.

### DAMAGES

Having concluded the liability issue in favor of the plaintiff, the court now addresses the issue of damages.

### FINDINGS OF FACT AS TO DAMAGES

1. The plaintiff, Phillip W. Bates, Jr., was born September 5, 1946 and was 40 years old at the time of trial. Pursuant to § 19–1–150 of the South Carolina Code of Laws (1976), he had as of the date of trial, a life expectancy of 34.05 years. Plaintiff had a work life expectancy of 20.28 years. Prior to his injury on July 3, 1984, plaintiff was in excellent health and had no previous history of back pain or difficulty.

2. As a result of the injuries plaintiff received on July 3, 1984, he suffers from permanent scarring of the sciatic nerve as a result of a severe contusion of the sciatic nerve suffered in the fall on July 3, 1984. The effect of this is a permanent impairment of motor function of the nerve and permanent pain that will prevent him from performing any activities that require prolonged sitting, standing, stooping, kneeling, crawling or climbing. The plaintiff's physicians have determined that his condition is permanent and that he is permanently disabled from performing the activities of any gainful employment, and I so find. Plaintiff testified that his pain is constant and that it feels like a "hot poker" in his leg. He is taking Dolobid daily for his pain. He also wears a TENS unit. The plaintiff testified that some days the pain is so bad he cannot get out of bed. On good days, the pain is less and he may spend a few hours working on miniature model cars in his garage. However, he never has a pain-free day and activity exacerbates his condition, producing more pain and prohibiting activity.

3. At the time of his injury, Bates was employed full time, earning $11.30 per hour. Since then his rate of pay would have increased to $13.50 per hour. Tony Smircic testified Bates was an excellent, conscientious employee who was a valuable asset to the company. Bates was Maricom's most senior electronics technician. He had received merit raises regularly and each year since 1979 had worked an average of 20.6% overtime. Oliver Wood, Ph.D., an expert in appraising economic loss in injury cases, testified that Bates' pretrial loss in earnings was $55,831 after tax considerations. He also testified that Bates suffered an after-tax post-accident loss in earnings of $441,420 discounted to its present cash value if he had worked a 2,000 hour a year period. In addition, Bates worked an average of 20.6% overtime for the five-year period preceeding the accident, and I find he would continue to do so, for an additional after-tax after-trial loss of $90,931.52. Bates therefore had a total loss in wages due to his inability to work of $588,182.52 after taxes.

4. The plaintiff's medical expenses to date total $12,253.13.

5. Another element of loss is the inability of the plaintiff to perform family services that he performed in the past. Prior to his injury, Bates performed auto maintenance and repairs, home maintenance and repairs and lawn care. The fact that these services had been gratuitously performed does not affect plaintiff's recovery. He performed an average of twelve (12) hours per week before his injury and can only perform an average of two (2) hours per week now. Dr. Wood testified, and I so find, that the before-trial loss in family services is $4,389, and the present value of after-trial loss is $51,680. This would not

be taxable and, therefore, should not be reduced for tax consideration although it has been reduced to its present cash value.

6. Dr. Dyana Lowndes-Rosen, M.D., a psychiatrist who has treated and evaluated Mr. Bates and Mrs. Bates, expressed the opinion that Mr. Bates has suffered severe depression and is experiencing great difficulty in adjusting to the changes required by his injuries, and feels helpless, unloved, resented and out of control of his situation. His relationship with his wife has suffered severely as a result of the injury. He is at home constantly and feels that he is a burden to his wife. She feels angry and resentful of this intrusion on her previously autonomous homelife and increased responsibilities around the home. Dr. William H. Snyder, a clinical psychologist who runs a pain management clinic, testified that he has treated the plaintiff; that plaintiff's pain is constant and can be exacerbated by any activities such as stooping, bending, sitting too long or climbing stairs.

7. I find that Mr. Bates has suffered substantial past and future pain and suffering and mental anguish, which is supported by the testimony of Mr. Bates, lay witnesses and medical experts.

8. I find that Mr. Bates has lost the ability to enjoy the normal activities of life he had enjoyed prior to his injury. Testimony showed that prior to the injury Mr. Bates was active with his family and in recreational endeavors and that he pursued several hobbies, including the restoration of antique automobiles, all of which he has been unable to perform as a result of the injuries he received July 3, 1984.

9. From the testimony of Mrs. Bates, I find that she has suffered the loss of comfort and society of her husband. Dr. Lowndes-Rosen testified that the marital and sexual relationship between Mr. and Mrs. Bates has been damaged. Mrs. Bates had previously depended on Mr. Bates for emotional as well as physical support. They are unable to engage in activities of mutual interest and in recreational activities, and their entire marital relationship has changed drastically as a result of Mr. Bates' injury.

## CONCLUSIONS OF LAW AS TO DAMAGES

1. The elements of damage that can properly be considered in determining the amount a personal injury plaintiff may be entitled to recover include plaintiff's loss of earning power, loss of family services, pain and suffering, loss of enjoyment of life, medical expenses, and future damages resulting from permanent injuries. *Denaux v. United States*, 572 F.Supp. 659 (D.S.C.1983). The court realizes that there is no yardstick by which pain and suffering, psychological damage, and impairment of earning capacity can be measured. Mathematical precision in fixing damages, however, is not demanded. *Brooks v. United States*, 273 F.Supp. 619, 629 (D.S.C. 1967).

2. I find that the plaintiff Phillip W. Bates, Jr. is entitled to recover the sum of $55,831.00 in pretrial lost earnings and $532,351.52 as post-trial lost wages reduced to present value.

3. The evidence presented supports an award of damages for plaintiff's loss of family services formerly provided to his family. The fact that these services have been gratuitously performed does not bar the plaintiff's recovery. *See Denaux*, 572 F.Supp. 659. I find that the plaintiff, Philip W. Bates, Jr., is entitled to recover $4,389.00 for loss of family services before trial and $51,680.00 for such after-trial loss reduced to present cash value.

4. Phillip W. Bates, Jr. was 40 years of age at the time of trial, and the evidence supports a finding that he will continue to endure pain and suffering for the remainder of his life expectancy of 34.05 years. The court finds that the plaintiff is entitled to an award of $2,820.00 for pain and suffering from the date of injury to the date of trial (a period of 940 days). The court further finds that he is entitled to recover $37,230.00 for future pain and suffering for another 34.05 years.

5. The court is aware that pain and suffering also includes mental anguish and permanent emotional scarring, which is a

substantial element in this case. *Steeves v. United States*, 294 F.Supp. 446, 458 (D.S.C. 1968). I find that the psychological and emotional damages in this case are substantial and that an amount to be awarded for these injuries should be separately considered and is at least equal to the value assessed to the pain and suffering aspect of plaintiff's claim. Therefore, the court finds that the plaintiff, Philip W. Bates, Jr., is entitled to $2,820.00 for psychological and emotional damages for his pretrial injury and $37,230.00 for his post-trial injury which he will endure for another 34.05 years.

6. This plaintiff has lost the ability to enjoy the normal activities of life he enjoyed prior to the injury, such as recreational activities. The court believes that the plaintiff is entitled to $2,000.00 for loss of enjoyment of life and the ability to enjoy recreational endeavors up to the time of trial and $30,000.00 for his post-trial loss for another 34.05 years.

 7. The plaintiff Fay Marie Bates is entitled to recover for her loss of consortium as a result of the injuries caused to her husband. This cause of action was authorized by the Supreme Court in *American Export Lines, Inc. v. Alvez*, 446 U.S. 274, 100 S.Ct. 1673, 64 L.Ed.2d 284 (1980). The wife of a longshoreman is entitled to recover damages for loss of consortium. *Doca v. Marina Mercante Nicaraguense, S.A.*, 634 F.2d 30, 34 (2d Cir.1980). Mrs. Bates is entitled to recover damages for the loss of comfort, companionship and society of her husband from the date of the accident, July 3, 1984, for the remainder of Mr. Bates' life. Mrs. Bates has also been forced to care for her husband as a nurse and is without the physical assistance or support of Mr. Bates. She has lost the ability to enjoy recreational activities they had formerly engaged in and is entitled to recover for the change in the parties marital relationship, life style, and sexual relationship. I find that Mrs. Bates has suffered a substantial loss as a result of Mr. Bates' injuries, and I find that an amount of $2,500.00 should be awarded to her for

her pre-trial loss and $37,000.00 for her post-trial loss.

8. I find that the plaintiffs are entitled to prejudgment interest. *Taliercio v. Compania Empressa Lineas Argentina*, 761 F.2d 126 (2d Cir.1985), at the rate of 14% per annum commencing July 3, 1984.

Based on the foregoing Findings of Fact and Conclusions of Law, it is

ORDERED, that judgment be, and the same is hereby, entered on behalf of the plaintiff, Phillip W. Bates, Jr., against the defendants in the amount of Seven Hundred Sixty-Eight Thousand Six Hundred Four and Sixty-Five/100ths ($768,604.65) Dollars, as follows:

| | | |
|---|---|---|
| A. | Loss of earning capacity (including pre-trial loss and post-trial loss reduced to present day value) | $588,182.52 |
| B. | Loss of family and personal services (including pre-trial and post-trial loss reduced to present day value) | $ 56,069.00 |
| C. | Pain and Suffering (including past amounts and future amounts reduced to present day value) | $ 40,050.00 |
| D. | Psychological and emotional injuries (including past amounts and future amounts reduced to present day value) | $ 40,050.00 |
| E. | Loss of enjoyment of life (including past amounts and future amounts reduced to present day value) | $ 32,000.00 |
| F. | Medical Expenses | $ 12,253.13 |
| | TOTAL JUDGMENT, PHILLIP W. BATES, JR. | $768,604.65 |

It is

ORDERED FURTHER, that judgment be, and the same is hereby, entered on behalf of Fay Marie Bates against the defendants for her claim for loss of consortium in the amount of Thirty-Nine Thousand Five Hundred and No/100ths ($39,-500.00) Dollars. It is

ORDERED FURTHER, that prejudgment interest on the above judgments shall be computed from July 3, 1984 to the date of the filing of this order at the rate of fourteen (14%) percent per annum. It is

ORDERED FURTHER, that post-judgment interest on the above judgments shall apply at the rate of seven (7%) percent per annum.

AND IT IS SO ORDERED.